**Mary K. HEELAN, Plaintiff,**

v.

**JOHNS–MANVILLE CORPORATION, Defendant.**

Civ. A. No. 76–F–207.

United States District Court,
D. Colorado.

June 16, 1978.

Lynn D. Feiger, Feiger & Lawson, Richard S. Shaffer, Denver, Colo., for plaintiff.

Richard L. Schrepferman, Jeffrey A. Chase, Holme Roberts & Owen, Denver, Colo., for defendant.

## MEMORANDUM OPINION

SHERMAN G. FINESILVER, District Judge.

In this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*, Mary K. Heelan seeks damages against her former employer, Defendant Johns-Manville Corporation [JM]. She claims that her refusal to have sexual relations with her supervisor, Joseph Consigli, resulted in her employment termination.

Defendant denies any impropriety by Consigli or corporate liability. Defendant contends that plaintiff was terminated for insubordination, lack of application, and general inability to perform at the level required of her position.

We find that JM is guilty of sex discrimination under Title VII, and that the retention of plaintiff's job as a JM project director was conditioned on the acceptance of sexual relations with her supervisor, a company executive.

## FACTS AND CONCLUSIONS [1]

Much of the testimony is conflicting, not only in privotal areas but in areas of marginal relevance as well. This case is based largely upon the court's view of the credibility of the witnesses, i. e. their worthiness of belief.

We have carefully scrutinized all testimony and the circumstances under which each witness has testified, and every matter in evidence which tends to show whether a witness is worthy of belief. For example, we have taken into account each witness' motive and state of mind, strength of memory and demeanor and manner while on the witness stand. We have considered factors which affect the witness' recollection and his or her opportunity to observe and accurately relate to the matters discussed. We have considered whether a witness' testimony has been contradicted, and the bias, prejudice, and interest, if any, of each witness. In addition, we have considered any relation each witness may bear to either side of the case; the manner in which each witness might be affected by a decision in the case; and the extent to which, if at all, each witness is either supported or contradicted by other evidence.

With these factors in mind we find the following as facts and enter our conclusions of law.

1. This memorandum contains an abbreviated statement of facts.

2. At some point in 1974, Consigli was promoted to Assistant Vice President for Facilities

## I

In 1971, JM, an international corporation, commenced moving its world headquarters from New York to Colorado. The move necessitated temporary offices at Greenwood Plaza near Denver, and ultimately complete construction of a 55 million dollar building and amenities at the Ken Caryl Ranch, Jefferson County, Colorado.

Joseph Consigli of the New York home office, as Director of Facilities Planning,[2] was transferred to Colorado to supervise a team to control and oversee the construction of the Colorado headquarters, obtain temporary office space, and assist relocation of 1500 JM employees and their families to Colorado.

In August 1971, plaintiff was hired by JM as a senior secretary and assigned to Consigli. Her employment with JM continued until May 31, 1974, when she was terminated by Consigli.

The documentary evidence of plaintiff's work performance at JM shows her to be an outstanding employee. All her evaluations rated her consistently excellent. Statements by plaintiff's co-workers also found her to be a good employee and, from their standpoint, no work-related reason existed for her termination. The only person to question plaintiff's competence is her supervisor, and these criticisms do not appear in any of his formal written evaluations, but only in his oral statements and privately maintained notes.

Initially plaintiff's work was typical secretarial work and included assistance in relocation of employees. Her starting salary was $6650 per year. Within a matter of months, plaintiff, under the direction of Consigli, was performing duties best characterized as a facilities planner. Consigli and staff had the responsibility of not only planning the world headquarters but also the interior design of the Greenwood Plaza office. Thus, a major part of her responsi-

Planning. Since May 1976, he has held the post of General Manager for Corporate Real Estate.

bilities involved coordination with the Space Design Group, a New York design firm responsible for the interior work at Greenwood Plaza. Plaintiff's worth was clearly apparent to Consigli and in March 1972 he recommended plaintiff for a "two step" raise, rather than the customary one step advance. The pay recommendation form (Ex. 3) noted that the pay raise was a "special merit increase." Consigli rated plaintiff's work as "excellent" in the following five categories: (1) ability, (2) application, (3) job performance, (4) cooperativeness, and (5) capacity for growth. Because of the unusual two step pay raise Consigli felt constrained to attach a note to the recommendation form indicating his high regard for Mrs. Heelan's excellent employment record.

In November of 1972, plaintiff was promoted at Consigli's recommendation to the position of "associate facilities planner" and her salary increased from $7,500 to $10,000. Her new position carried with it considerable responsibility and attaining the associate position was a major accomplishment. The job description for the associate position provided that it would be filled by a person with a degree, or its equivalent, in architectural design supplemented by courses in business administration and management. Plaintiff had none of these qualifications. Plaintiff's performance in her more responsible position merited a raise in July 1973. The raise came, in part, as a result of her outstanding annual evaluation which was completed on May 23, 1973. The subjective portion of the evaluation indicated that plaintiff performed her duties as JM's "principal contact with design and planning professions and interior contractors . . . very well and exceeded most objectives." Consigli also noted that Mrs. Heelan's "greatest accomplishment and talent" was "[i]n solving problems and adjusting schedules to meet changing job conditions. Her rapport with the design and planning disciplines is a great asset to the company." In the objective portion of the appraisal, Consigli gave plaintiff the highest grades printed on the form.

Soon after the pay raise recommendation, Consigli recommended plaintiff for a JM "A" award. According to a JM President's Bulletin, the "A" award is given to employees

> who, through initiative, ability and wholehearted interest in the Company, perform with unusual merit and show extraordinary accomplishments. . . . [¶] Administration of "A" awards requires a high degree of managerial judgment. Selection and approval must be exercised with utmost care.

(Ex. 11) Plaintiff received her "A" award on June 15, 1973 by letter from the president of JM, Dr. William Goodwin, and a monetary award of $1,000. Another raise to $12,100 followed in November. This raise was the result of a company wide upward adjustment of salary levels and included the following comments:

> Mary's application to her work and often on her own initiative, and job performance has been excellent. She has excellent ability and capacity for growth.

In Spring of 1973, JM began its construction efforts of the world headquarters at the Ken Caryl Ranch. The Architects' Collaborative [TAC] was selected as the architect; Turner Construction Company [Turner] was the construction manager; and Space Design was chosen to do the interior work. To assist him, Consigli hired Eric Dienstbach as project manager to work with the TAC to coordinate its efforts with the requirements of Turner and JM. Plaintiff, as associate of Facilities Planning, had the responsibility of working with Space Design to coordinate its efforts with the requirement of JM and Turner. In the Fall, plaintiff told Consigli that she felt that although she was doing the same type of work as the department's single project manager, Eric Dienstbach,[3] she was paid less and held the lower title of "associate." Plaintiff claimed that this was a case of sex

---

3. Eric is the son of Isabelle Dienstbach, a JM vice president and administrative assistant to the president of JM. Mr. and Mrs. Consigli were personal friends of Mrs. Dienstbach and this relationship certainly assisted Eric's advancement in JM.

discrimination. She requested promotion to Project Director. Consigli conferred about plaintiff with his immediate supervisor Francis May, an executive vice president, and Richard Goodwin, then president of JM.

Although Heelan had an excellent performance record, serious reservations were expressed by top management about her attitude which was, at times, stated to be abrasive and arrogant. After several meetings with top management, Consigli recommended plaintiff's promotion to project manager which was approved in February 1974.

## II

Mrs. Heelan articulated specific romantic advances made by Consigli beginning in April 1972, and extending through April 23, 1974, when she was informed of her termination. The sexual advances were occasioned as an integral part of her employment. The initial advances were made in April 1972. Consigli explained that the world headquarters duties would involve substantial travel responsibilities and family sacrifices. Plaintiff indicated her willingness to assume the duties and fulfill travel requirements. During the conversation Consigli put his arm around plaintiff and said that she really did not yet understand the job requirement but that she would in time. Explicit sexual invitations followed in late 1972, and continued on a regular basis through early 1974. All were refused.

In January 1973, Consigli had lunch with Space Design Group's Ronald Phillips. Although they had been discussing business Consigli began to talk about his affection for Mrs. Heelan. Consigli volunteered that he liked plaintiff very much but was not sure that he could have an affair with her as he was married. Phillips was surprised by the conversation and did not respond. Later that month Phillips was again brought into the situation, this time by plaintiff. On January 23, plaintiff, who had now worked with Phillips for over a year, told him that she was distressed about her relationship with Consigli. Plaintiff related that he had offered her an apartment if she would leave her husband and consent to an affair. Phillips apparently told no one about his discussions with Consigli and plaintiff.

During the last few months of her employment Consigli's sexual advances became more frequent, occurring as often as once a week. The final demand came on April 23, 1974. Plaintiff was called into her supervisor's office and told that she was to have an affair or be fired. Plaintiff refused any sexual relations with Consigli and was given notice that May 31, 1974 would be her last day of employment.

The evidence is in conflict as to whether plaintiff was offered another position at JM or extended an offer to return to her former position.

## III

During the months of sexual harassment, plaintiff for the most part kept the matter to herself. On occasion, however, she discussed the matter with Eric Dienstbach, Ronald Phillips, Isabelle Dienstbach, and Francis May. On at least one occasion Consigli mentioned the possibility of an affair to Ronald Phillips.

Although plaintiff repeatedly refused any sexual relationship with Consigli, she did begin an affair with her co-worker, Eric Dienstbach, sometime in September or October. Plaintiff denied the liaison but the evidence contradicts her position. Both Consigli and Isabelle Dienstbach suspected the affair. Consigli asked Mrs. Dienstbach to question her son about the matter. Eric denied having an affair when questioned by his mother. She testified that she did not believe this denial. Of more importance, however, is the fact that during the discussion Eric told his mother that Consigli was pressuring plaintiff to have an affair with him. Mrs. Dienstbach testified that she did not believe this statement either, but nonetheless questioned Consigli. He denied the charge and Mrs. Dienstbach did not pursue the matter. Just when this discussion occurred is in dispute—Eric saying that it happened in February or March 1974 while Isabelle recalling the incident to have occurred earlier. Whatever the exact date,

this discussion provided notice to top JM management that Consigli might have been making sexual advances toward Mrs. Heelan.[4] It also alerted Consigli to the fact that others knew of those advances. At the earliest, the discussion would have taken place in late 1973 since, according to Eric Dienstbach his affair did not begin until September or October. This time period coincides with the time when, according to Consigli, plaintiff's work product seriously declined.

Some time in December 1973 or January 1974, plaintiff made an appointment to speak with Isabelle Dienstbach. Mrs. Dienstbach had for a long period served as a sounding board for many of the female employees at JM who had work-related problems. At the meeting, plaintiff told Mrs. Dienstbach about Consigli's sexual demands, that they were being made weekly, and that she did not know how to stop the incidents. This meeting was another instance when Isabelle Dienstbach was informed of Consigli's actions. During this period plaintiff again confided in Ronald Phillips of Space Design Group and Eric Dienstbach.

After plaintiff's notice of termination on April 23, she again sought out Isabelle Dienstbach. Plaintiff discussed the termination with her and was told to schedule a meeting with Francis May. Plaintiff met with May at the end of that month. She informed him, as she had informed Isabelle Dienstbach twice before, that Consigli had fired her not because of her work performance but because of her refusal to submit to her supervisor's sexual demands. May suggested that plaintiff discuss the matter with JM's personnel manager. Mrs. Heelan responded that May was the personnel manager's supervisor and that the personnel manager would in all probability not take action unless May ordered it. May agreed and declined to do anything at that time. After the meeting, May telephoned Consigli and asked him about plaintiff's charges.

Consigli denied any wrongdoing and the matter was dropped.

## CONCLUSIONS OF LAW

The law in this area is of recent vintage. Few trial courts have published pertinent opinions in the Federal Supplement. *Corne v. Bausch and Lomb, Inc.,* 390 F.Supp. 161 (D.Ariz.1975), *rev'd on other grounds,* 562 F.2d 55 (9th Cir. July 28, 1977); *Williams v. Saxbe,* 413 F.Supp. 654 (D.D.C.1976); *Miller v. Bank of America,* 418 F.Supp. 233 (N.D. Cal.1976); *Tomkins v. Public Service Elec. & Gas Co.,* 422 F.Supp. 553 (D.N.J.1976), *rev'd,* 568 F.2d 1044 (3d Cir., 1977); *Munford v. James T. Barnes & Co.,* 441 F.Supp. 459 (E.D.Mich.1977). In addition, only three Courts of Appeals have reviewed this issue. *Tomkins, supra; Barnes v. Costle,* 561 F.2d 983 (D.C.Cir. 1977); *Garber v. Saxon Business Prods.,* 552 F.2d 1032 (4th Cir. 1977).

From these opinions a body of law is developing which, first and most importantly, recognizes that sexual harassment of female employees is gender-based discrimination which can violate Title VII. *Tomkins, supra,* slip opinion at 7–8; *Barnes, supra,* at 990; *Munford, supra* at 466. See also Note, *Civil Rights, Sexual Advances by Male Supervisory Personnel as Actionable Under Title VII of the Civil Rights Act of 1964,* 16 So.Tex.L.J. 409 (1976).

In order to recover on such a claim, however, the plaintiff must allege and establish that submission to the sexual suggestion constituted a term or condition of employment. A cause of action does not arise from an isolated incident or a mere flirtation. These may be more properly characterized as an attempt to establish personal relationships than an endeavor to tie employment to sexual submission. Title VII should not be interpreted as reaching into sexual relationships which may arise during the course of employment, but which do not have a substantial effect on that

---

4. As noted, Isabelle Dienstbach was an assistant vice president of the corporation and administrative assistant to the then president.

employment. In general, we would limit Title VII claims in this area, as suggested by one commentator, to "repeated, unwelcome sexual advances" which impact as a term or condition of employment. Comment, *Employment Discrimination-Sexual Harassment and Title VII.*, 51 N.Y.U.L. Rev., 148, 163–64 (1976).

█ It is not necessary for a plaintiff to prove a policy or practice of the employer endorsing sexual harassment. *Contra, Corne v. Bausch and Lomb, Inc., supra; see* Comment, *supra.* To demand that a plaintiff prove a company-directed policy of sexual discrimination is merely to extend a claim for relief with one hand and take it away with the other. In no other area of employment discrimination do the courts require such proof. *See e. g., Ostapowicz v. Johnson Bronze Co.*, 369 F.Supp. 522 (W.D. Pa.1973). The employer is responsible for the discriminatory acts of its agents. *Barnes v. Costle, supra* at 993; *Young v. Southwestern Sav. & Loan Ass'n*, 509 F.2d 140, 144 n. 7 (5th Cir. 1975); *Munford v. James T. Barnes & Co., supra* at 466; *Tidwell v. American Oil Co.*, 332 F.Supp. 424 (D.Utah 1971); and *see* 42 U.S.C. § 2000e(b).

█ Thus, to present a *prima facie* case of sex discrimination by way of sexual harassment, a plaintiff must plead and prove that . (1) submission to sexual advances of a supervisor was a term or condition of employment, (2) this fact substantially affected plaintiff's employment, and (3) employees of the opposite sex were not affected in the same way by these actions.[5]

█ This, however, does not end the inquiry. Under certain circumstances the employer may be relieved from liability. As noted by the court in *Miller v. Bank of America, supra,* where the employer has no knowledge of the discrimination, liability may be avoided if the employer has a policy or history of discouraging sexual harassment of employees by supervisors and the employee has failed to present the matter to a publicized grievance board. If the employer is aware of the situation and rec-

tifies it, the employer may not be held liable for the acts of its agent. *Barnes v. Costle, supra* at 993.

█ This case can be determined on relatively narrow grounds. It is clear that the repeated sexual demands made on Mrs. Heelan by her supervisor over a two year period developed into a "term or condition" of employment. The facts here do not present a borderline case in which this court must decide whether the acts complained of substantially affected the terms of employment, or were nothing more than a personal flirtation unrelated to plaintiff's job. Here we have the paradigm of the repeated, unwelcome sexual advance. Comment, *Employment Discrimination-Sexual Harassment and Title VII., supra* at 163–64.

Nor in this case do we have the problem reviewed in *Barnes v. Costle, supra,* and *Munford v. James T. Barnes & Co., supra,* concerning the liability of the employer for the unknown acts of its supervisor-employee. We have considered and reject JM's argument that plaintiff failed to take advantage of JM's internal grievance procedures. First, the evidence fails to establish the existence of any such procedure and second, during her tenure plaintiff advised top management of her allegations. We find that she did everything within her power to bring her charges to the attention of top management. Here, the employer through its highest officers, knew of the charges of sexual harassment. In JM's organizational scheme Consigli answered to only two people; JM's president William Goodwin and its executive vice president Francis May. May was informed of plaintiff's claims after her termination and did nothing more than call the "accused" for verification or denial. More importantly, the administrative assistant to the president had heard charges of impropriety from two sources prior to plaintiff's termination. Her investigation was no more thorough than May's. The depth and scope of these inquiries can hardly satisfy the corporation's obligation under Title VII.

---

**5.** Plaintiff has proven all three requisites. We note that evidence indicated no sexual ad-

vances against male employees by any JM supervisor.

■ The effect of the Civil Rights Act of 1964, and particularly of Title VII of that Act, has been to impose on employers certain duties which theretofore did not exist. No major employer in this nation can ignore the requirements of equal opportunity in hiring, promotion and general conditions of employment. What little legislative history that exists in the area of sex discrimination has convinced the courts that "Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." *Sprogis v. United Air Lines, Inc.,* 444 F.2d 1194 (7th Cir. 1971). This stereotype of the sexually-accommodating secretary is well documented in popular novels, magazine cartoons and the theatre. As we have indicated, Title VII does not concern itself with sexual liaisons among men and women working for the same employer. Title VII does, however, become involved when acceptance of sexual advances is transformed into a condition of continued employment. *Comment, Title VII; Legal Protection Against Sexual Harassment,* 53 Wash.L. Rev. 123 (1977).

■ Under the facts of this case, the frequent sexual advances by a supervisor do not form the basis of the Title VII violation that we find to exist. Significantly, termination of plaintiff's employment when the advances were rejected is what makes the conduct legally objectionable. Receptivity of repeated sexual advances by a high level supervisor was inescapably a condition of the plaintiff's continued employment. The termination of plaintiff's employment as a retaliatory measure when advances were rejected are within the purview of Title VII.

■ If employers have reason to believe that sexual demands are being made on employees they are obligated under Title VII to investigate the matter and correct any violations of the law. Moreover, employers must inform employees that management is receptive to such complaints and, if proved true, that management will rectify the situation. If the employer fails to respond to a valid complaint, it effectively condones illegal acts. *See* Ginsburg & Koreski, *Sexual Advances by an Employee's Supervisor: A Sex-Discrimination Violation of Title VII?,* 3 Employee Relations L.J. 83, 92 (1977). Just as the law would not permit an employer to ignore complaints of discrimination based on race, religion or national origin, Title VII does not permit an employer to ignore complaints that supervisors are imposing as a condition of employment, accession to sexual demands.

Although we need not decide the matter, we question whether Consigli himself could not fairly be characterized as the employer, rather than as the supervisor. Here the "supervisor" answers to only two other officers in the entire multinational corporation. When he travels he is provided with a company hotel suite, a company limousine, and a company chauffeur. "The point on the managerial hierarchy at which supervisors become part of the 'employer' is a question of fact which would have to be determined in each case." Ginsburg & Koreski, *Sexual Advances by An Employee's Supervisor, supra.*

■ An employer is liable under Title VII when refusal of a supervisor's unsolicited sexual advances is the basis of the employee's termination; acceptance of sexual advances by a supervisor of high level management cannot be made a condition of job retention and it constitutes discrimination under Title VII.

Gender-based sexual harassment occasioned on plaintiff is prohibited under Title VII of the Civil Rights Act.

Plaintiff was sexually harassed and males were not sexually harassed by plaintiff's supervisor and a *prima facie* showing of a gender-based application of a practice or policy in violation of Title VII has been proven by plaintiff. JM has failed to rebut plaintiff's *prima facie* case.

Defendant, JM, has failed to affirmatively establish the absence of discrimination by the clear weight of the evidence.

■ Defendant's allegations that plaintiff's termination was based on poor work performance instead of refusal of a supervisor's sexual advances has not been established. Defendant must establish by clear weight of the evidence that these allega-

tions were not a pretext. This JM has failed to do.

In the context of this case, an employer—as JM—is liable for Title VII violations occasioned by discriminatory practices of supervisory personnel.

■ Plaintiff is entitled to damages in the form of back pay and lost employment benefits. Appropriate considerations include the difference between the salary plaintiff would have made had she remained in the JM organization and that which she actually made since her departure by way of unemployment compensation, wages, and the like. A determination of the proper amount of damages will be made in a separate order. In addition, plaintiff's attorneys are entitled to an award of reasonable attorneys' fees to be paid by defendant Johns-Manville Corporation.