Rita COLEY, Plaintiff,

v.

CONSOLIDATED RAIL CORPORATION,
a/k/a Conrail, Defendant.

Civ. A. No. 81–71619.

United States District Court,
E.D. Michigan, S.D.

Nov. 18, 1982.

Stanley E. Wise, Southfield, Mich., for plaintiff.

T. Patrick Durkin, Detroit, Mich., for defendant.

## OPINION GRANTING JUDGMENT IN FAVOR OF PLAINTIFF

PATRICIA J. BOYLE, District Judge.

■ Plaintiff, a former employee of defendant, brought this action under 42 U.S.C. § 2000e–2 and the Elliott-Larsen Civil Rights Act, M.C.L.A. 37.2101 *et seq.,* for alleged sexual harassment and discrimi-

nation based on national origin during her employment by defendant. Plaintiff contends that these conditions caused plaintiff's resignation and constituted a constructive discharge. The matter was tried to the bench, and the following will constitute findings of fact and conclusions of law. Fed.R.Civ.P. 52(a). Title VII of the Civil Rights Act prohibits discrimination on the basis of sex.[1] M.C.L.A. 37.2202 also prohibits employment discrimination because of sex. Sexual harassment is specifically included as discrimination because of sex, M.C.L.A. 37.2103(h).[2] Although Title VII does not specifically speak of sexual harassment, it is now well settled that such conduct can amount to discrimination on the basis of sex under Title VII. *See Henson v. City of Dundee,* 682 F.2d 897 (11th Cir. 1982); *Bundy v. Jackson,* 641 F.2d 934 (D.C. Cir.1981); *Tomkins v. Public Service Electric & Gas Co.,* 568 F.2d 1044 (3d Cir.1977); *Barnes v. Costle,* 561 F.2d 983 (D.C.Cir. 1977); *Garber v. Saxon Business Products, Inc.,* 552 F.2d 1032 (4th Cir.1977); *Hill v. BASF Wyandotte Corp.,* 27 Fair Empl.Prac. Cas. (BNA) 66 (E.D.Mich.1981); *Munford v. James T. Barnes & Co.,* 441 F.Supp. 459 (E.D.Mich.1977). Furthermore, the EEOC Guidelines on Sexual Harassment, 29 C.F.R. § 1604.11 (1981),[3] take the position that

1. Section 703 of Title VII, 42 U.S.C. § 2000e–2 provides:
   (a) It shall be an unlawful employment practice for an employer—
   (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, *sex,* or national origin.
   (Emphasis added.)

2. M.C.L.A. 37.2103(h) provides:
   Discrimination because of sex includes sexual harassment which means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature when:
   (i) Submission to such conduct or communication is made a term or condition either explicitly or implicitly to obtain employment, public accommodations or public services, education or housing.
   (ii) Submission to or rejection of such conduct or communication by an individual is

used as a factor in decisions affecting such individual's employment, public accommodations or public services, education, or housing.
   (iii) Such conduct or communication has the purpose or effect of substantially interfering with an individual's employment, public accommodations or public services, education, or housing, or creating an intimidating, hostile, or offensive employment, public accommodations, public services, educational, or housing environment.

3. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

harassment on the basis of sex is a violation of Section 703 of Title VII.[4]

■ The elements of a prima facie case of sexual harassment are: (1) the employee belongs to a protected group, (2) the employee was subject to unwelcome sexual harassment, (3) the harassment complained of was based upon sex, (4) the harassment complained of affected a "term, condition, or privilege" of employment, and (5) respondeat superior. *Henson v. City of Dundee, supra,* at 903–05.[5]

Plaintiff satisfied the requirement of the first element, *i.e.,* that she belong to a protected class. I find that the plaintiff was subject to unwelcome sexual harassment, satisfying the requirements of the second element. With respect to the requirement that the harassment complained of be based on sex, there is no evidence that male employees were subjected to similar harassment.

Plaintiff is a twenty-seven year old female of Mexican-American heritage. Plaintiff began working for defendant on November 6, 1976.

She alleges that while employed at defendant's FACT terminal she was subjected to sexual harassment and ethnically disparaging remarks[6] by her immediate supervisor, Ben Webb, Assistant Manager of the terminal. Mr. Armand Pelliccione was the manager of the terminal at all relevant times.

Plaintiff's responsibilities as a switch bill clerk required her to have her work reviewed at least once a day by Mr. Webb. Therefore, plaintiff had occasion to be in Mr. Webb's office frequently. I credit her testimony that over a period of time beginning in late 1979 after her return from a sick leave and assignment to the FACT terminal Mr. Webb consistently made sexually explicit and demeaning remarks to Mrs. Coley which were neither encouraged, invited, or condoned by her. These included references to the size of her "boobs," keeping track of her menstrual periods on his office calendar and making remarks about her moods in relation thereto, and repeated inquiries as to when she was going to "do something nice for him." These inquiries became more insistent over time until in early March before plaintiff was to take a vacation Mr. Webb began to count down the days which plaintiff had left to do something nice or he "would stop being nice and start to get mean."[7] Also, I credit plaintiff's testimony that she was so frightened by the implications of these remarks that she did not report for work on the last scheduled work day preceding her vacation.

29 C.F.R. § 1604.11(a).

**4.** Congress, in enacting Title VII, did not confer upon the EEOC authority to promulgate rules or regulations pursuant to that title. Although the guidelines are entitled to consideration in determining legislative intent, courts may properly accord less weight to such guidelines than to administrative regulations which have the force of law or to regulations which under the enabling statute may themselves supply the basis for imposition of liability. *General Electric Co. v. Gilbert,* 429 U.S. 125, 141, 97 S.Ct. 401, 410, 50 L.Ed.2d 343 (1976).

**5.** In *Hill v. BASF Wyandotte Corp., supra* at 71, the court stated that to establish a prima facie case of sexual harassment plaintiff must prove: (1) a supervisor made sexual advances toward her, (2) submission to such sexual advances was a term or condition of employment, (3) this fact substantially affected plaintiff's employment or was the motivating factor in her termination, and (4) male employees were not affected in the same way by the alleged conduct.

*See also Heelan v. Johns-Manville Corp.,* 451 F.Supp. 1382, 1389 (D.Colo.1978). While the *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), formulation is appropriate in sexual harassment cases, where as here plaintiff has presented direct credited evidence of discrimination, *McDonnell Douglas* analysis need not be undertaken, *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1017 n. 18 (5th Cir.1979).

**6.** Plaintiff's proofs with regard to ethnic disparagement were comparatively slight, and I find that plaintiff has failed to carry the burden of proof with regard to this claim.

**7.** I note that while Mr. Webb denied that he had made other remarks to Mrs. Coley he acknowledged having asked her when she was going to do something nice for him, describing this as a routine remark designed to encourage increased efforts on the part of subordinates after he had done them some job-related favor.

Plaintiff's employment was contractually governed by a collective bargaining agreement with the Brotherhood of Railway, Airline and Steamship Clerks (BRAC) which permitted interclassification bumping by more senior employees. Under the agreement, Plaintiff had ten days after a bump to exercise her right to bid or bump into another position failing which she would lose her seniority.

When Mrs. Coley returned from vacation, she learned that on March 7, 1980, she had been bumped from her position as switching clerk. She attempted to bump a steno position but failed the typing test. While I credit plaintiff's testimony that she believed that her failure to obtain that position was attributable to Mr. Webb, I cannot and need not conclude for purposes of this opinion that Mr. Webb actually arranged for plaintiff to be unable to take the test under conditions which made it impossible for her to pass.

On April 9, plaintiff bumped into the supply clerk job at the FACT terminal and began work in that position.

When plaintiff attempted to bump into the supply clerk position, the chief clerk presented a bump slip for plaintiff's signature which had been approved by Mr. Webb. The slip described the job as requiring the loading and unloading of vans and semi-trucks "often alone." Plaintiff concluded that Mr. Webb was following up on his threats and signed the slip indicating thereon in her writing that she was signing under threat of discharge. While the objective proofs support defendant's claim that this warning was not aimed at plaintiff but was a policy outgrowth of prior difficulty in the position, this conclusion is not inconsistent with plaintiff's perception that it was part of Mr. Webb's harassment or with the ultimate conclusion of defendant's liability based on the events of the next several days.

After work on April 10, plaintiff sought out Mr. Pelliccione to discuss the situation. Plaintiff and Mr. Pelliccione met at the Town Grill & Bar. Plaintiff explained her position regarding the added job description and complained that Mr. Webb was sexually harassing and intimidating her. While Mr. Pelliccione did not recall in detail plaintiff's complaints, he did recall plaintiff saying she was uneasy about Mr. Webb and his use of the phrase "when are you going to do something nice for me." Mr. Pelliccione testified that he thought it a serious complaint and that he told plaintiff he would investigate.

The following day, Friday, April 11, 1980, plaintiff was detailed by the chief clerk to unload a van. She asked another employee to assist her, and when he was called back by the clerk, plaintiff concluded Mr. Webb was again responsible.

Having unsuccessfully attempted to locate Mr. Pelliccione during the workday, plaintiff went to the Town Grill hoping to find him there. Mr. Pelliccione and Mr. Webb arrived there together and joined plaintiff. After an hour or so, Mr. Pelliccione left. Plaintiff and Mr. Webb remained there drinking, and according to plaintiff, Mr. Webb made several explicit sexual remarks and told her she could not get away from his control.

Plaintiff left at about 9:00 p.m. It is undisputed that she was extremely upset. Later that night, she reported the evening's events to her husband. Between 2:00 and 3:00 a.m., plaintiff's husband called Mr. Webb at his home. When confronted with Mrs. Coley's version of what had happened, Mr. Webb apologized, stated that he did not remember having said the things reported, but if he had, "it was the booze talking."

It is also undisputed that the following day Mr. Webb twice called the Coley residence offering to find a job for plaintiff outside of his jurisdiction. Mrs. Coley refused any such offer because of her belief that Mr. Webb's influence could reach her wherever she was employed at Conrail. Plaintiff's own testimony and the deposition testimony of Drs. Howard Wright and Merlin Townley establish that plaintiff was seriously psychologically affected by these events.

Mr. Pelliccione testified that he became aware of the plaintiff's accusations regarding Mr. Webb's actions at the Town Grill and of Mr. Coley's phone call, on Saturday morning, April 12, while he and Mr. Webb were at work. He further testified that Mr. Webb in his presence called Mr. Coley and offered plaintiff jobs that would not involve contact with Mr. Webb, that Mr. Webb told him he did not remember what had happened, and that he (Webb) was visibly upset. Mr. Pelliccione testified that he nonetheless did not call Mrs. Coley nor take any steps to investigate the incident at that time, because he did not think it was necessary since he did not know how serious it was. He further testified that he did call plaintiff ten days to two weeks later to persuade her to come back to work but that when plaintiff told him she was too upset to do so he did not ask what had occurred between she and Mr. Webb, because he did not think it appropriate to discuss the situation on the telephone.

Plaintiff did not return to work and has not worked since leaving defendant's employ. I find that the foreseeable impact of defendant's conduct placed plaintiff in a situation which forced her resignation.

■ The requirement that the harassment complained of affect a "term, condition, or privilege" of employment is made out by a showing of a "nexus" between the sexual conduct and the employment situation. *See Sand v. George P. Johnson Co.,* No. 79–73425 (E.D.Mich. May 7, 1982); *Hill v. BASF Wyandotte Corp., supra.* The classic example of a nexus between the harassment and a term, condition, or privilege of employment is the situation in which plaintiff is fired because of her refusal to succumb to sexual demands. This has been called *quid pro quo* sexual harassment. *Henson v. City of Dundee, supra* at 908 n. 18. *See, e.g., Heelan v. Johns-Manville Corp.,* 451 F.Supp. 1382 (D.Colo.1978); *Munford v. James T. Barnes & Co.,* 441 F.Supp. 459 (E.D.Mich.1977).

■ Nonetheless, direct action by the employer is not the only way the nexus between harassment and employment can be established. Sexual conduct affects employment if it has the effect of "unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment." 29 C.F.R. § 1604.11(a)(3) (1981). Such was the case in *Henson v. City of Dundee, supra.* In that case, plaintiff, a police dispatcher, complained that the police chief subjected her to numerous harangues of demeaning sexual inquiries and vulgarities and repeated requests that she have sex with him. The plaintiff claimed that the harassment ultimately led her to resign. The Eleventh Circuit found that tangible job detriment was not required.

> Sexual harassment which creates a hostile or offensive environment for members of one sex is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality. Surely, a requirement that a man or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest of racial epithets.

*Id.* at 902 (footnote omitted). The *Henson* court held that a state of psychological well-being is a term, condition, or privilege of employment within the meaning of Title VII. However, to state a claim under Title VII, sexual harassment must be (1) sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment and (2) be sufficiently severe and persistent to affect seriously the psychological well-being of employees. *Accord, Bundy v. Jackson,* 641 F.2d 934 (D.C. Cir.1981). *See also Sand v. George P. Johnson, Co., supra,* slip op. at 9.

■ I find that the conduct of Benjamin Webb created a hostile and offensive working environment that was sufficiently severe and persistent to affect seriously the psychological well-being of the plaintiff.

The final element necessary for a prima facie case of sexual harassment is that of respondeat superior. This has been stated as a requirement that the employer know of the harassment in question and failed to

take prompt remedial action. *Henson v. City of Dundee, supra,* at 905; *Munford v. James T. Barnes & Co.,* 441 F.Supp. 459, 466 (E.D.Mich.1977). Some courts have imposed liability upon employers for sexual harassment by their agents or supervisory personnel regardless of the employers' knowledge. *See, e.g., Miller v. Bank of America,* 600 F.2d 211, 213 (1979); *Barnes v. Costle,* 561 F.2d 983, 993 (D.C.Cir.1977).[8] Other decisions have required plaintiff to show that the employer knew or should have known of the sexual harassment. *Tomkins v. Public Service Electric & Gas Co.,* 568 F.2d 1044, 1048–49 (3d Cir.1977); *Heelan v. Johns-Manville,* 451 F.Supp. 1382, 1389 (D.Colo.1978).

I am persuaded by the reasoning in *Henson v. City of Dundee, supra.* There the Eleventh Circuit distinguished between "hostile environment" sexual harassment and *quid pro quo* sexual harassment (harassment in which a supervisor demands sexual consideration in exchange for job benefits) with respect to the employer's knowledge. In the former case actual or constructive knowledge by the employer must be shown whereas in the latter case an employer was held to be strictly liable for the action of its supervisors that amounted to sexual harassment resulting in tangible job detriment to the subordinate employee. The court reasoned:

> We recognize that this holding requires differing treatment of respondeat superior claims in the two types of sexual harassment cases. In the classic *quid pro quo* case an employer is strictly liable for the conduct of its supervisors, while in the work environment case the plaintiff must prove that higher management knew or should have known of the sexual

harassment before the employer may be held liable. The rationale underlying this difference in the treatment of the two cases is easily stated. The environment in which an employee works can be rendered offensive in an equal degree by the acts of supervisors, coworkers, or even strangers to the workplace. The capacity of any person to create a hostile or offensive environment is not necessarily enhanced or diminished by any degree of authority which the employer confers upon that individual. When a supervisor gratuitously insults an employee, he generally does so for his reasons and by his own means. He thus acts outside the actual or apparent scope of the authority he possesses as a supervisor. His conduct cannot automatically be imputed to the employer any more so than can the conduct of an ordinary employee.

> The typical case of *quid pro quo* sexual harassment is fundamentally different. In such a case, the supervisor relies upon his apparent or actual authority to extort sexual consideration from an employee. Therein lies the *quid pro quo.* In that case the supervisor uses the means furnished to him by the employer to accomplish the prohibited purpose. He acts within the scope of his actual or apparent authority to "hire, fire, discipline or promote." Because the supervisor is acting within at least the apparent scope of the authority entrusted to him by the employer when he makes employment decisions, his conduct can fairly be imputed to the source of his authority.

(Citations and footnotes omitted.) 682 F.2d at 910. *See also, Miller v. Bank of America,* 600 F.2d 211, 213 (9th Cir.1979).

8. With respect to the employer's knowledge, the EEOC guidelines distinguish between agents and supervisory employees and fellow employees. 29 C.F.R. § 1604.11 provides, in part:

(c) [A]n employer . . . is responsible for its acts and those of its agents and supervisory employees with respect to sexual harassment regardless of whether the specific acts complained of were authorized or even forbidden by the employer and regardless of whether the employer knew or should have known of their occurrence . . . .

(d) With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action.

I find that the defendant first received knowledge of the sexual harassment by Benjamin Webb on April 10, 1980, the day plaintiff told Armand Pelliccione, the FACT terminal manager, about her harassment by Mr. Webb in a conversation at the Town Grill. At that point, the defendant had a duty to investigate the complaint of sexual harassment and to take *prompt remedial action*. *Henson v. City of Dundee, supra* at 905; *Bundy v. Jackson,* 641 F.2d 934, 943 (D.C.Cir.1981); *Tomkins v. Public Service Electric & Gas Co.,* 568 F.2d 1044, 1048–49 (3d Cir.1977); *Barnes v. Costle,* 561 F.2d 983, 993 (D.C.Cir.1977); *Hill v. BASF Wyandotte Corp.,* 27 Fair Empl.Prac.Cas. 69, 71 (E.D.Mich.1981); *Heelan v. Johns-Manville Corp.,* 451 F.Supp. 1382, 1390 (D.Colo.1978); *Munford v. James T. Barnes & Co.,* 441 F.Supp. 459, 466 (E.D.Mich.1977).

I find that defendant failed to take such remedial action. Armand Pelliccione merely told plaintiff to ask Benjamin Webb what he wanted of her. Mr. Pelliccione did not investigate the complaint nor take any remedial action nor did Mr. Pelliccione take any action upon learning of the events of April 11.

The defendant's failure to act promptly in response to plaintiff's complaint of sexual harassment caused plaintiff's resignation and resulted in a constructive discharge.

Prompt remedial action by defendant may have prevented the incident between plaintiff and Mr. Webb. Defendant's failure to investigate the complaint and promptly remedy the situation permitted the offensive work environment to continue and, thus, caused plaintiff's resignation.

Defendant concedes in its trial brief that to establish constructive discharge in the Sixth Circuit the intent of the employer need not be to induce the employee to resign but only that the working conditions imposed be such that a reasonable person would terminate his employment. This position is consistent with the holding in *Jacobs v. Martin Sweets Co.,* 550 F.2d 364, 370

(6th Cir.) *cert. denied,* 431 U.S. 917, 97 S.Ct. 2180, 53 L.Ed.2d 227 (1977), where constructive discharge was established by conditions properly considered intolerable and plaintiff's "quitting" involuntarily. Recently, the Sixth Circuit reaffirmed this standard for constructive discharge in *Held v. Gulf Oil Co.,* 684 F.2d 427 (6th Cir.1982).[9] The *Held* court read *Jacobs v. Martin Sweets Co., supra,* as an endorsement of the proposition that "a man is held to intend the foreseeable consequences of his conduct." *Held* also approved the standard for discrimination found in *Bourque v. Powell Electrical Manufacturing Co.,* 617 F.2d 61, 65 (5th Cir.1980).

> To find constructive discharge we believe that 'the trier of fact ·must be satisfied that the . . . working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled ·to resign.' *Alicea Rosado v. Garcia Santiago,* 562 F.2d 114, 119 (1st Cir.1977).

(Ellipsis in original.)

I find that the defendant's failure to take prompt remedial action permitted the offensive work environment to continue, that the sexual harassment of plaintiff by Benjamin Webb amounted to intolerable working conditions, and that a reasonable person would have felt compelled to resign. Therefore, I find that plaintiff's termination of employment was a constructive discharge.

Having found that a violation of Title VII and of the Elliott-Larsen Act resulted in the termination of plaintiff's employment, the court is now faced with the task of calculating the damages recoverable by plaintiff. Plaintiff concedes that she is entitled to recover only back wages under Title VII. With respect to back wages, plaintiff had a duty to mitigate her damages. *See Bourque v. Powell Electrical Manufacturing Co.,* 617 F.2d 61, 65–66 (5th Cir.1980). Defendant's argument in its trial brief that plaintiff failed to mitigate her

---

**9.** The defendant contended that a constructive discharge could not be found unless the court found "that the defendant engaged in a deliberate or intentional course of conduct calculated to force the employee into an involuntary resignation." At 432.

damages is supported by the evidence in this case. I find that plaintiff wholly failed to mitigate her damages.

Plaintiff's own testimony establishes that her current lack of employment is attributable to a failure to attempt to find employment because of her defensive attitudes toward middle-aged males. There is no evidence, however, that plaintiff is psychologically disabled from employment. Moreover, the duty to mitigate contemplates that plaintiff, for her own psychological rehabilitation, confront that which while difficult to undertake is yet possible. Mrs. Coley is a sensitive, capable, and intelligent woman. From May 17, 1980, her treating physicians' notes indicate no complaints regarding psychological difficulties. Ms. Sheila Shives, a crisis center counselor with whom Mrs. Coley treated, testified that her contacts with plaintiff ended as of late April, 1980. Dr. Townley's testimony establishes that plaintiff's complaints, while corroborative of plaintiff's psychological distress following her resignation in April, 1980, and prior to sessions contemporaneous with trial of the lawsuit, otherwise related to domestic difficulty, pregnancy, and financial problems.

I find that the latest time the proofs substantiate plaintiff's inability to work as a proximate result of the final sexual advance by Mr. Webb is late December, 1980. Therefore, I find that plaintiff is entitled to recover back wages of Five Thousand Two Hundred and 00/100 Dollars ($5,200.00), based on her income for 1980.

Section 801 of the Elliott-Larsen Act, M.C.L.A. § 37.2801, provides that a person alleging a violation of the act may bring a civil action for appropriate injunctive relief or damages or both. "Damages" is defined in M.C.L.A. 37.2801(3): "As used in subsection (1), 'damages' means damages for injury or loss caused by each violation of this act, including reasonable attorney's fees." Courts in this district have read this statutory section so as to allow recovery for compensatory and exemplary damages, *Freeman v. Kelvinator, Inc.*, 469 F.Supp. 999 (E.D.Mich.1979), and for damages based on humiliation and embarrassment, *Moll v.*

*Parkside Livonia Credit Union*, 525 F.Supp. 786 (E.D.Mich.1981). There is ample evidence that plaintiff suffered mental anguish and humiliation as the result of her sexual harassment by Mr. Webb. Plaintiff shall recover Five Thousand and 00/100 Dollars ($5,000.00) for these injuries. Plaintiff is therefore awarded Ten Thousand Two Hundred and 00/100 Dollars ($10,200.00). Plaintiff may also recover reasonable attorneys fees. 42 U.S.C. § 2000e–5(k).

ACCORDINGLY, judgment will enter in favor of plaintiff Rita Coley.