H. Finley DOWNES, Petitioner,

v.

**FEDERAL AVIATION ADMINISTRATION, Respondent.**

**Appeal No. 85–588.**

United States Court of Appeals, Federal Circuit.

Oct. 18, 1985.

Robert F. Belovich, Parma, Ohio, argued for petitioner.

Platte B. Moring, III, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for respondent. With him on brief were Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director and Sandra P. Spooner, Asst. Director.

Perry A. Kupietz, Federal Aviation Admin., Des Plaines, Ill., of counsel.

Before RICH, Circuit Judge, COWEN, Senior Circuit Judge, and NIES, Circuit Judge.

NIES, Circuit Judge.

The decision of the Merit Systems Protection Board (board or MSPB), sustaining the charges against petitioner H. Finley Downes of sexual harassment of female employees as the basis for his demotion and reassignment, is reversed.

## I.

On April 30, 1983, Downes was demoted and reassigned from his position as Supervisory Aviation Safety Inspector (Grade 15), at the Cleveland General Aviation District Office (GADO), a position he had held since December 1979, to the position of

Aviation Safety Inspector (Grade 14) in Des Plaines, Illinois.

As the basis for this adverse action, the agency specified five charges:

1. Failure to follow a direct order by a superior official.

2. Discrimination based on sex by reassigning a particular duty from a female to a male inspector.

3. Failure to deal effectively with an employee's complaint and giving false information in an investigation.

4. Sexual harassment by engaging in a pattern of abusive and offensive sexual behavior directed to female employees in violation of 29 C.F.R. § 1604.11(a)(3).

5. Sexual harassment by suggesting or inferring that sexual favors by females are the basis for employment, training or promotional opportunities in violation of 29 C.F.R. § 1604.11(a)(2).

Charge 2 was withdrawn by the agency and charges 1 and 3 were not sustained by the presiding official because of failure of proof. The presiding official upheld charge 4 upon a finding that the agency proved each of the four alleged instances of misconduct.

The status of charge 5 is uncertain. Charge 5 was not mentioned in the agency's decision letter; however the presiding official considered that the two instances underlying that charge were relied on by the agency and held that one was proved. He then considered that instance as part of the pattern of the offensive environment set out in charge 4. The other instance of charge 5 was held not to have been proved. Because of these circumstances, petitioner argues that charge 5 was not sustained while the agency argues that upholding the one instance of charge 5 means that the

charge was sustained as a violation of Section 1604.11(a)(2).

The MSPB denied Downes' petition for review. Accordingly, the presiding official's decision became the final decision of the board.

## II.

Sexual discrimination in employment can take a variety of forms. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2000e–17 (1982), was designed to prevent discrimination in employment, *inter alia,* because of sex, in the sense of *gender.* However, because the statute prohibits discrimination with respect to an employee's "condition" of employment, 42 U.S.C. § 2000e–2(a),[1] the statute has been read as prohibiting sexual harassment by offensive behavior directed to one or more employees in the workplace. In such cases, "sex" is taken to mean "sexual" although, under the theory that such conduct has a disparate impact on one sex over the other, it continues to mean gender as well.[2] Sexual harassment is used herein in the sense of offensive behavior of a sexual nature which is prohibited by Title VII.

The classic example of sexual harassment is the situation in which sexual demands are made by a supervisor to a subordinate in exchange for career advantages or under threats of adverse job consequences. Because tangible job consequences are involved, this type of offense has been characterized as "quid pro quo" sexual harassment. *See, e.g., Henson v. City of Dundee,* 682 F.2d 897, 908 (11th Cir.1982). Sexual harassment has also been recognized because of offensive sexually related conduct which interferes with an employee's work performance or which creates an intimidating, hostile or offensive

1. Section 2000e–2(a) states:
 It shall be an unlawful employment practice for an employer—(I) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . .

2. *See generally* McLain, *The EEOC Sexual Harassment Guidelines: Welcome Advances Under Title VII?,* 10 U.Balt.L.R. 275 (1981); Note, *Sexual Harassment Claims of Abusive Work Environment Under Title VII,* 97 Harv.L.Rev. 1449 (1984) (hereinafter cited as *Sexual Harassment* ).

working environment, irrespective of whether the complainant is threatened with actual economic consequences. *Id.*, 682 F.2d at 901. This appeal deals with sexual harassment of both types.

The regulations embodying these concepts are found in 29 C.F.R. § 1604.11(a) and (b), which read as follows:

> (a) Harassment on the basis of sex is a violation of Sec. 703 of Title VII. [Footnote omitted.] Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.
>
> (b) In determining whether alleged conduct constitutes sexual harassment, the Commission will look at the record as a whole and at the totality of the circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred. The determination of the legality of a particular action will be made from the facts, on a case by case basis.

These regulations are directed to determination of a formal claim for relief from sexual harassment by an employee.[3] However, sexual harassment may also be the basis for adverse action against a federal employee. *See, e.g., Jackson v. Veterans Administration,* 768 F.2d 1325 (Fed.Cir.

1985). In either case, the alleged violation must be judged by the same standard.

### III.

#### *Quid Pro Quo Harassment*

■ In order to clear Downes' record, we will adopt the government's view that charge 5 based on Section 1604.11(a)(2) was sustained, that is, that the board found that Downes used sexual favors as the basis for his decisions on advancement and other personnel action.

A single incident of *quid pro quo* harassment under Section 1604.11(a)(2) may be sufficient to sustain that type of charge. *Joyner v. AAA Cooper Transportation,* 597 F.Supp. 537 (M.D.Ala.1983); *Sexual Harassment, supra* note 2, at 1458. Here, however, all elements of that charge were not proved.

Charge 5 was based on the following statements in an affidavit by Ms. Jones[4]:

> Fin has asked me if I have ever thought about trading favors to get ahead in the agency. He's also said, "Boy, if I had a body like yours, I'd really go places."

The Jones affidavit, if accepted as true in all respects, contains no hint that sexual favors were "used as the basis for employment decisions." There is, indeed, no evidence that Downes requested sexual favors from any employee, including Ms. Jones. He repeatedly and publicly praised the *professional* work of Ms. Jones, which in her affidavit she viewed as creating resentment in co-workers. He increased Ms. Jones' responsibilities in response to her complaints against her *previous* supervisors, which she had revealed to Downes at professional meetings long before he was connected to the Cleveland GADO. She advanced in grade regularly. There is no evidence of retaliation for denial of sexual

---

**3.** The regulations do not have the force of law, *General Electric Co. v. Gilbert,* 429 U.S. 125, 141, 97 S.Ct. 401, 410, 50 L.Ed.2d 343 (1976), but rather are guidelines. We will call them regulations here since they are the basis for the charges.

**4.** To avoid unnecessary publicity to the persons involved in this appeal, we will follow the presiding official's example of identifying the principal witness against Downes as Ms. Jones and will repeat the facts only to the extent necessary to an understanding of the opinion. The reader's interest need not be piqued. Nothing sensational is involved.

favors. A necessary element of "quid pro quo" harassment under Section 1604.-11(a)(2)—that there be a reward or penalty from the alleged harasser—is lacking.

In addition, the record does not indicate the context in which the subject remark was made. There is no indication of what preceded or followed the alleged remark. There is no indication when it occurred. One must even infer that he was her supervisor at the time. No failure can be attributed to Downes to develop the record on this point. It was part of the agency's case, and it is at this point that the Jones affidavit, the only evidence, is inadequate to sustain the charge.

Due to a critical illness, Ms. Jones became unavailable for deposition or trial testimony, which Downes sought. While we will, for purposes of the appeal, accept the presiding official's ruling to admit the affidavit under the circumstances and to find it credible for what it contains, the agency cannot benefit from her unavailability to the extent of being relieved of its burden of proof of the elements of the charge against Downes by a preponderance of the evidence.

Turning to what the presiding official actually said about the incident, we quote from his decision because it indicates confusion between the two very different types of sexual harassment:

> There is little doubt that when a supervisor makes remarks to a female employee about getting ahead on the job by trading sexual favors and at the same time suggests to her that a body like hers would advance one's career, he offends the prohibition against sexual harassment. It has been held that sexual harassment occurs if the proscribed conduct creates a discriminatory or offensive work environment even though the complaining employees have not lost any tangible job benefits as a consequence. *Deatrick v. Department of Treasury*, MSPB Docket No. SF07528110474 at 6 [9 MSPB 507, 10 M.S.P.R. 262] (1982), *citing Bundy v. Jackson*, 641 F.2d 934, 943–44 (D.C.Cir.

1981). This incident, when considered with the instances described in specification 4, was not isolated, but was only one in a pattern that permeated the workplace, creating an intimidating, hostile and offensive environment. Therefore, I conclude that the agency has proven instance 1 by the preponderance of the evidence.

From the above, it appears that the presiding official did not consider it necessary to rule on whether instance 1 established a Section 1604.11(a)(2) violation. However, if he intended to do so, the finding that the incident occurred is insufficient to establish violation of that regulation without evidence that it resulted in specific job action. Here, the record as a whole is overwhelming that Downes never *used* sexual favors or denials as the basis for employment decisions affecting Ms. Jones. That was the charge and the presiding official erred in not analyzing its elements. The charge is too serious to permit a lapse into generalities and conclusory findings.

Since the record is inadequate as a matter of law to establish instance 1 of charge 5 as "quid pro quo" harassment, we do not remand for a redetermination by the presiding official. To the extent the adverse action rested on Section 1604.11(a)(2), it cannot be sustained. The incident will, however, be taken into account as part of charge 4 directed to offensive environment.

## IV.

### Intimidating, Hostile or Offensive Environment

#### A.

■ To establish a claim of sexual harassment for creating an intimidating, hostile or offensive environment, the decisions which have recognized a claim based on that type of misconduct have required at least two elements: (1) the offensive conduct must be sufficiently pervasive so as to alter the conditions of employment, and (2) be sufficiently severe and persistent to affect seriously the psychological well-being of an employee. *Henson v. City of*

*Dundee*, 682 F.2d 897, 904 (11th Cir.1982); *Bundy v. Jackson*, 641 F.2d 934, 943–44 (D.C.Cir.1981); *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972); and *Coley v. Consolidated Rail Corp.*, 561 F.Supp. 645, 649 (E.D.Mich.1982).

■ While the aim of the U.S. government as employer should be to free its workplace of offensive sexual remarks entirely, the statute and the subject regulations do not create a claim of sexual harassment for each and every crude joke or sexually explicit remark made on the job by employees, even supervisors. The courts have uniformly held that a *pattern* of offensive conduct must be proved which is perpetuated or condoned by an employer to such an extent that an employee's job performance or state of psychological well-being is adversely affected.

In connection with a comparable racial harassment charge, Judge Goldberg stated in his landmark *Rogers* decision:

> One can readily envision working environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers.

*Rogers v. EEOC*, 454 F.2d at 238.

Similarly, with respect to sexual harassment, the elements of a claim have been set forth as follows:

> The *Henson* court held that a state of psychological well-being is a term, condition, or privilege of employment within the meaning of Title VII. However, to state a claim under Title VII, sexual harassment must be (1) sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment and (2) be sufficiently severe and persistent to affect seriously the psychological well-being of employees. *Accord, Bundy v. Jackson*, 641 F.2d 934 (D.C.Cir.1981). *See also Sand v. George P. Johnson, Co.*, [No. 79–73425, slip op. at 9 (E.D.Mich. May 7, 1982)].

*Coley v. Consolidated Rail Corp.*, 561 F.Supp. at 649.

The District of Columbia Circuit has held:

> We note that although a pattern or practice of harassment directed at a single employee can violate Title VII, casual or isolated manifestations of a discriminatory environment, such as a *few ethnic or racial slurs, may not raise* a cause of action. *Cariddi v. Kansas City Chiefs Football Club, Inc.*, 568 F.2d 87, 88 (8th Cir.1977); *Fekete v. U.S. Steel Corp.*, 353 F.Supp. 1177, 1186 (W.D.Pa. 1973); *see Int'l Brhd of Teamsters v. United States*, 431 U.S. 324, 336 n. 16, 97 S.Ct. 1843, 1854 n. 16, 52 L.Ed.2d 396 (1977).

*Bundy v. Jackson*, 641 F.2d at 943 n. 9 (emphasis added).

■ Thus, proof of occasional, isolated, and/or trivial remarks of a sexual nature do not satisfy the first element of the claim under Section 1604.11(a)(3). The offensive conduct must be persistent.

As explained by Senator Humphrey, "a pattern or practice would be present only when the denial of rights consists of something more than an isolated, sporadic incident, but is repeated, routine, or of a generalized nature." 110 Cong.Rec. 14,270 (1964).

### B.

The Section 1604.11(a)(3) charge against Downes was premised on four incidents:

1. Referring to Ms. Jones as "the Dolly Parton of the office" in a conversation with two visitors to the facility which a female employee overheard.

2. Speculating on the frequency of Ms. Jones sexual relationships after her divorce, in a telephone conversation with her in January, 1982.

3. Describing a woman (non-employee) who wore tight shorts and repeating a joke attributed to Bob Hope about such attire to staff members.

4. Touching Ms. Jones' hair on two occasions.

The presiding official found that each of these incidents was proved. Taking them together and adding the charge 5 incident, we cannot agree that the record as a whole supports the conclusion that Section 1604.-11(a)(3) was violated.

Downes was supervisor of Cleveland GADO for more than three years. He is charged with at most five incidents of sexually offensive conduct during that period.[5] The incidents were not shown by the agency or found by the presiding official to be representative of his conduct. The charge, thus, stands or falls on these incidents alone. Three instances involve only Ms. Jones and were not shown to be known to others. Downes' suggestive remark, about her being "the Dolly Parton of the office," was overheard by another woman staff member who was offended. The final instance—the joke—was heard by staff members but was specifically associated with the apparel of an outsider.

 Even discounting the trivial nature of some incidents, these few instances, which we assume to have occurred, do not establish a pattern of harassment directed to "female employees" or to a particular employee. They do not show that conduct has been repeated to the point where it is "routine" or "of a generalized nature," i.e., has become a "condition" of anyone's employment. *Bundy v. Jackson*, 641 F.2d at 944 (sexual harassment by several supervisors was "standard operating procedure" in agency); *Carroll v. Talman Federal Savings & Loan Assn.*, 604 F.2d 1028, 1032–33 (7th Cir.1979) (uniforms for women but not men bank tellers); *Cariddi v. Kansas City Chiefs Football Club, Inc.*, 568 F.2d 87, 88 (8th Cir.1977) (ethnic comments not "excessive and opprobrious"). Indeed, Ms. Jones stated that no offensive remarks were made by Downes after she called him "gross" and hung up on him during the January, 1982, telephone conversation.

The context in which the statements by Downes occurred was not established by the agency, nor considered by the presiding official. To illustrate the importance of context, Downes admitted and explained one hair incident, testifying as follows:

A. I told them I recalled one time. This had to do with the time that we had discussed, or I discussed with [Ms. Jones], or she and I discussed her dress, where she had told me that her two previous chiefs had told her she had to dress like a man because she was doing a man's job, and it would be appropriate for the job she was doing. I told her that she was a lady, and as far as I was concerned she could dress like any other lady would, commensurate upon the job she had to do that particular time.

Up to that time, she had been wearing her hair more or less piled—whatever you call it. I don't understand women's hairdos, but piled up on top of her head, more or less. We also talked about that. I told her that she could wear her hair in any style that she felt was appropriate for a lady to wear her hair. The result of that was she did start wearing her hair down in whatever you call it, and the other type of clothing that she bought and started wearing.

Now, I remember one time going by her desk and taking these two fingers on a couple of strands of hair about the first time she did, and said, "[Ms. Jones], your hair looks great that way." I told her that, and I kept on walking.

\* \* \* \* \* \*

5. Ms. Jones' affidavit, on which the charges here principally rest, is a rambling discourse on all of the problems she perceived in the office, e.g., poor scheduling of work for the clerical staff; imposition on her of a last minute assignment; thefts from her desk; poor morale; and mistreatment of her by fellow workers (not Downes). Principally, Ms. Jones objected to office gossip about her relationship with one or more male co-workers and to Downes' failure to deal with it effectively. The 30 pages of the affidavit must be scrutinized to find any complaints of sexual harassment by Downes. Her real complaint was against office gossip concerning her possible liaisons with co-workers. Such a situation, while no doubt distressing to her, was not evidence of sexual harassment *by Downes*. The charges (1 and 3) relating to his having been derelict in dealing with her complaint about the gossip were not sustained.

It was a gesture of friendliness or whatever you want to call it, or understanding or appreciation of her hair. I might tell a man he had a nice necktie on that day. That's all it amounted to, as far as I was concerned.

I never heard any repercussions from it at all, one way or the other, until this thing came up.

If Downes' testimony is true—and it was not found incredible—(indeed, the presiding official relied on it as an admission) it illustrates that touching a woman's hair may or may not be a sexual gesture.

Similarly, Downes testified that Ms. Jones frequently called him at home at night to discuss numerous problems, personal and professional. The incident of Downes' remark made during a phone call—if it occurred in a late night call *from her*—is of a distinctly different character from a face to face office conversation.

■ The important point is that the offensiveness of conduct cannot be judged simply by proving that an incident involving sexual remarks occurred without considering the context.

### C.

■ A second element of offensive environment is proof that the misconduct interfered with an employee's work or caused serious psychological damage. The agency's proof and argument, as well as the decision of the presiding official, exhibits no awareness that the requirement of an adverse impact on an employee is even a factor in the charge. Thus, the standard applied by the MSPB was wrong as a matter of law. The decision rests solely on the basis that some of the instances were proved to have occurred.

■ Ms. Jones, the office's Equal Employment Opportunity Representative, did not file a formal complaint of sexual harassment. Ms. Jones' affidavit, to the extent she expresses her distress, tied it to other employees' gossip, which she considered some form of sexual harassment. Regardless of whether that might be rele-

vant evidence in a claim by her against the agency, it is not relevant to the personal charge made by the agency against Downes. The record is wholly devoid of evidence that Downes' remarks interfered with anyone's work or psychological well-being. Indeed, the portion of the record supplied to us indicates that every female employee of the Cleveland GADO, except Ms. Jones, signed a petition or letter approving of Downes as a manager. Since there is no other evidence on this point, the charge against Downes for violation of Section 1604.11(a)(3) is not supported by substantial evidence.

### D.

■ Downes was not demoted for failing to perform his job as a supervisor, but on specific charges of sexual harassment under Section 1604.11(a). When such a charge is made, the agency must be held to the same standard as an individual or a class of complainants who might bring the charge. In this case, the agency did not meet that standard.

### V.

Downes raises other issues concerning the violation of procedural due process by reliance on the affidavit of Ms. Jones, the failure of the agency to provide him with initial counselling before taking action, and questions whether the Jones affidavit was a complaint against him for sexual harassment at all. We have not addressed these issues, and it should not be inferred that they are resolved in reaching our decision here.

### VI.

The elements of neither claim of sexual harassment have been established. Accordingly, the decision of the MSPB sustaining the adverse action against Downes is *reversed.*

REVERSED.