Elizabeth VERMETT, Plaintiff,

v.

HOUGH, Gerald L., Director of the Michigan Department of State Police; The Michigan Department of State Police; Morrison, Harold, Captain; Fries, James, Lt., Haydon, James, Lt.; Tomczyk, William, Lt.; Deon, Francisco, Lt.; Raczowski, Earl, Sgt.; Jefferson, Thomas, Sgt.; and all officers and employees of the Michigan Dept. of State Police; and Haire, David R., individually and as a Trooper in the Michigan Department of State Police, Defendants.

No. G 82–55.

United States District Court,
W.D. Michigan, S.D.

Jan. 29, 1986.

Marjorie B. Schaafsma, Grand Rapids, Mich., Jean L. King, Ann Arbor, Mich., for plaintiff.

Frank J. Kelley, Atty. Gen. by Deborah Anne Devine, Asst. Atty. Gen., Lansing, Mich., for defendants.

## OPINION

ENSLEN, District Judge.

This case involves alleged sex based discrimination in employment; specifically, allegations of sexual harassment, sex discrimination, and constructive discharge brought by a former female State Trooper against the Michigan Department of State Police ("Department") and named officials and police officers. Plaintiff Elizabeth Vermett's Complaint, filed February 5, 1982, and amended September 13, 1983, is in seven counts and seeks injunctive and monetary relief. It states that it is brought to enforce civil and constitutional rights pursuant to 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.), and the Michigan Elliott-Larsen Civil Rights Act (M.C.L.A. § 37.2101 et seq.). Counts sounding in retaliation, breach of contract, assault, and intentional infliction of emotional distress were also included. Jurisdiction was purported to be based upon 28 U.S.C. § 1331, 28 U.S.C. § 1343(3), 28 U.S.C. § 1343(4), and this Court's pendent jurisdiction over state law claims. By Opinion and Judgment Order dated March 7, 1984, 606 F.Supp. 732, Defendants' Motion to Dismiss Complaint or for Summary Judgment was granted in part; denied in part. Plaintiff's claims under Title VII (including retaliation and constructive discharge) remain pending in this Court.

The issue of liability, having been severed from that of damages, was tried to the Court between October of 1984 and May of 1985. Presented as lay witnesses were Plaintiff Elizabeth Vermett; Defendant Lt. William Tomczyk, Post Commander at the Northville Post of the Michigan Department of State Police ("Northville") since 1974; Defendant Lt. James Haydon, Post Commander of the Sault Ste. Marie Post of the Michigan Department of State Police ("Sault") since 1975 (testified by deposition of May 26, 1983); Defendant Earl Raczkowski, assigned to Northville from May 1978 throughout Plaintiff's employment with the Department (testified by

deposition of February 27, 1985); Defendant Sgt. Thomas Jefferson, assigned to Northville since 1979; Defendant David Haire, Trooper at Northville since 1978; Col. Ritchie Davis, Deputy Director of the Department's Bureau of Technical Services, formerly Captain and in charge of the Department's Personnel Division (from approximately mid-1978 to May 1981); Sgt. Michael Kanuth, Detective Sergeant at the Department's Ypsilanti Post, formerly Trooper at Northville from 1976 to 1982; Sgt. Gregory Aho, Sergeant at the Department's Detroit Freeway Post, Trooper at Northville from 1978 to 1982; William Fields, Trooper at Northville since 1978; Sgt. Harry Broadbent, assigned to Northville since 1978; and Sgt. Sandra Miller, assigned to the Department's Ypsilanti Post, formerly Trooper at Northville from 1978 to 1982. Expert witnesses included Donald Rossi, Ph.D., Clinical Psychologist, Director of the Department's Behavioral Science Section and private practitioner in psychoanalysis, psychotherapy, psychological evaluations, and organizational consultations; Mark Hinshaw, M.D., private practitioner in psychiatry; Lynn W. Blunt, M.D., Clinical Director of the Ann Arbor Center for Forensic Psychology and a private practitioner in psychiatry (testified in the latter capacity); R. Kent Boesdorfer, Senior Consultant with Organizational Leadership, Inc., testifying as an expert in organizational change, including the integration of women and the behavioral issue of sexual harassment within the organization; and Hilda Patricia Curran, Director, Office of Women and Work for the Michigan Department of Labor, testifying as an expert in state government on the issue of sexual harassment. Numerous documents were admitted into evidence, including two journals (diaries) authored by Plaintiff, totalling nearly 500 pages.

In preparing this Opinion, and weighing the sharply contrasting lay and expert testimony, I have reviewed the entire record and considered the briefs submitted by the parties. Having done so, and having observed the witnesses, heard the evidence, read the exhibits presented at the time of trial, and made credibility determinations, I make the following findings of fact and conclusions of law, as required by Rule 52(a) of the Federal Rules of Civil Procedure (FRCP).[1]

I. GENERAL

Plaintiff Elizabeth Vermett ("Vermett") was born June 7, 1953. She spent approximately the first eighteen years of her life in Milan, Michigan, where she lived with her parents. She had no siblings. Vermett received an Associate's Degree in Criminal Justice from Washtenaw Community College in 1977. She has also earned credits at Michigan State University in criminal justice.

A. *Recruit School*

In 1978, Vermett attended and graduated from the 93rd Recruit School of the Michigan Department of State Police. Recruit School is, by all accounts, rigorous both physically and emotionally. Out of 75 male and 22 females admitted to the school, 53 males and 10 females graduated. Vermett's cumulative averages indicate she graduated 30th in the final 63 (above class average). Her Final Recruit Evaluation, completed approximately May 26, 1978, indicates Vermett was "strong" in academic ability, personality traits (although overly quiet at times), personal bearing and appearance, attitude and interest, and typing/printing/spelling ability. She was

---

1. My opinion is this case is based largely upon my view of the credibility of the witnesses. In making those assessments, I have carefully scrutinized all testimony and the circumstances under which it was given, and any evidence bolstering or detracting from the believability of the witness. I have considered, among other factors, the state of mind and demeanor of each witness while testifying, his or her opportunity to observe and accurately relate to the matters discussed, the bases for any opinions given by the witness, whether the testimony has been contradicted, any biases or prejudices of the witness, the manner in which the witness may be affected by a decision in this case, and the extent to which the testimony of the witness is supported or contradicted by other evidence.

found "acceptable" in initiative and dependability, leadership potential, composure and control, relationship and cooperation with others, physical abilities/stamina/condition, driving ability, marksmanship ability, and water safety ability.[2]

B. *Sault*

Plaintiff took the oath of a State Police Trooper on May 26, 1978. On May 15, 1978, Plaintiff certified that she received a copy of the Michigan State Police Departmental Rules and Regulations, dated January 1, 1977. On February 21, 1978, she certified that she had been furnished with the Department of Civil Service Revised State Employer Relations Policy, dated March 1, 1977.

Plaintiff was assigned to the Sault as a probationary trooper. The Sault Post, located in the Upper Peninsula, was relatively small, with approximately nine troopers, four sergeants, one detective, and a post commander. Vermett was the first female trooper ever assigned to the Sault. She reported to the Post in late May 1978, and remained until her February 1979 discharge for unsatisfactory service during the probationary period.

The facts surrounding Vermett's employment at the Sault are disputed in many respects, including the extent of her training, whether she was properly assigned a senior (or training) officer, alleged discriminatory attitudes and conduct of the other troopers and command personnel toward her as a trooper and as a female, Vermett's work performance as a trooper, her alleged bad attitude, her alleged use of profanity, and her alleged failure to follow orders. Because of my conclusion on the timeliness issue, found later in this Opinion, it is unnecessary for me to resolve these disputes or to make a determination as to whether Vermett was subject to sex discrimination and/or sexual harassment at the Sault. Suffice to say that, for whatever reasons, Vermett's employment at the Sault was

ultimately unsuccessful and psychologically damaging.

Following her discharge, Vermett on March 5, 1979 filed a discrimination charge with the Equal Employment Opportunity Commission (EEOC). The particulars specified in support of her claim that she was discriminated against on the basis of her sex included failure to assign one senior officer to assist and support Vermett in her early months on the Post, being treated and evaluated differently than male troopers at the Sault, and her discharge on February 6, 1979. After discussion between attorneys for Vermett and the Department, a Settlement Agreement was drafted. It stated that it was not an admission by the Department of a Title VII violation or a judgment by the EEOC on the merits of Vermett's charge, and provided, in exchange for an agreement by Vermett not to institute a lawsuit under Title VII based upon the EEOC charge, that she be reinstated as a confirmed (non-probationary) trooper at the Northville Post (with full seniority and benefits) effective May 14, 1979, that Vermett receive a monetary back pay award of $4,233.60, that any and all documents and entries relating to the facts and circumstances leading to the filing of the EEOC charge (including performance evaluations, negative memos and all entries of the February 6, 1979 discharge) be eliminated from Vermett's employment records and personnel files, and that Vermett would not be penalized in any way in her future employment with the Department because of proceedings arising under the EEOC charge. The Settlement Agreement was signed by the Department on May 11, 1979, by Vermett on May 29, 1979, and by the EEOC on May 30, 1979.

C. *Northville*

Vermett was reinstated to Northville on May 14, 1979. The Northville Post, located west of Detroit, was substantially larger than the Sault. When Vermett was as-

---

**2.** Rating categories included, from highest to lowest: outstanding, strong, acceptable, needs improvement, weak.

signed there, she was one of over 80 troopers. She was the fifth female. The Post was divided into four squads. During her employment at Northville, Vermett was assigned as a trooper in the Fourth, and later the Second Squads. Her last active day of work at Northville was February 19, 1981. She subsequently remained on extended medical leave until December 18, 1982, when she entered into a redemption agreement pursuant to a claim under the Workers' Compensation Disability Act, M.C.L.A. § 418.101 et seq.

Plaintiff contends that during the course of her employment at Northville she was repeatedly subjected to demeaning, hostile, and offensive verbal and physical conduct by fellow trooper David Haire and by commanding officers; that she was intentionally, deliberately, and purposefully subjected to this discriminatory conduct and harassment based on her sex; and that this conduct had the effect of unreasonably interfering with her work performance and created an intimidating, hostile, and offensive work environment.

For purposes of clarity, my findings relative to Vermett's employment at Northville are separated according to subject matter.

II. NORTHVILLE

Lt. William Tomczyk was the Post Commander at Northville during Vermett's employment there as a trooper. He had commanded about six females before Vermett. The Northville Post was divided into four squads. Each squad of troopers was supervised by two sergeants, all under the command of Lt. Tomczyk. When Vermett arrived at Northville, each squad had one or two female troopers. Vermett was initially assigned to the Fourth Squad, where she was the only female trooper.

A. *Vermett's Performance—Fourth Squad*

Vermett arrived at the Fourth Squad in May of 1979. Her sergeants were Thomas Jefferson and Earl Raczkowski. Both sergeants testified as to her performance in their squad.

Shortly after she was assigned to the squad, Sgts. Jefferson and Raczkowski called Vermett into their office to welcome her, discuss the squad, and familiarize her with the operation of the Post. Since they had no paperwork on Vermett, they inquired of her as to her training status. Vermett's response was very defensive. She asked, with tears in her eyes, why she was called in to meet with them. When informed that they had no information on her background and needed to determine if she needed training, Vermett responded by insisting that she was a confirmed trooper. She did not indicate that she felt she had in any way been inadequately trained. Lt. Tomczyk verified to the sergeants, after contacting Lansing, that Vermett was a confirmed trooper and was to be treated accordingly.

Vermett's first assignment was to work on the road with Trooper Donald Worden, a trusted senior officer who was to familiarize Vermett with the operation of the Post and the Post area. Worden had worked with females at Northville before, apparently without difficulty. Shortly after Worden began working with Vermett, he asked his sergeants to be relieved of the assignment. As grounds for this request, Worden indicated to the sergeants that he did not get along well with Vermett and did not like the way she worked. According to Worden, Vermett was lazy, her work performance on the road was shaky and tentative, and she did not really try to do the job. Worden did not indicate that Vermett's sex was a factor in his request.

Vermett next worked with Trooper William Fields, a black male. Fields was viewed by his sergeants as competent, calm, strong, and possessed with a great deal of expertise. The sergeants decided that Fields could assist Vermett and could assure her safety, as well as his own, on the road. Fields was not told of difficulties in Vermett's background; nor was he instructed to keep reports on her performance for the sergeants. After working with Vermett for about six months, Fields requested, verbally and in writing, to be relieved of the assignment. Fields indi-

cated to the sergeants that Vermett was argumentative, incompetent, exercised poor judgment on the road, and jeopardized the safety of both of them. Fields opined that Vermett had no desire to learn the job.

Trooper Fields testified that he asked not to work with Vermett because of constant bickering over how to do the job and because she was not a very good police officer. Vermett was complacent as to her assignments, uncertain as to how to write complaints, and had a hostile attitude toward advice. He found it disturbing that Vermett did not know things she should have learned at Recruit School. Although Vermett's performance improved over the six months, it remained inadequate. Vermett never told him she was inadequately trained. The problems between Vermett and Fields were unrelated to her being a female. In fact, Fields liked Vermett as a person; not as a police officer.

Other troopers in the Fourth Squad subsequently asked not to be assigned to work with Vermett, including Trooper Kelly Hillary, who indicated she used poor judgment and was argumentative while on road patrol, Trooper Gregory Aho, who did not want to work with Vermett for personal reasons, and Trooper David Haire. Aho testified that he worked on the road with Vermett for about two to three weeks. He asked to have another partner at his wife's request. He had worked with another female partner previously and had no problems. Aho did not believe Vermett was a very good police officer. Vermett never indicated to him that she felt she was improperly trained.

Both Sgts. Jefferson and Raczkowski periodically discussed Vermett's job performance problems with her, and made suggestions on how to improve. Although every trooper was interviewed each six months concerning his or her performance, Vermett was counseled more frequently because the sergeants detected in her the same performance problems repeatedly. Vermett was counseled as to her report writing, her lack of knowledge concerning criminal and traffic laws, and her demean-

or within the squad. Vermett would indicate her awareness of the problems, but would attempt to correct them for only brief periods of time. At some time during her assignment on the Fourth Squad, Vermett attended "Retread School," a program of three to four weeks of advanced trooper training. Vermett went there after she indicated that she had not had the opportunity to do so while at the Sault.

Introduced as an exhibit was a report, written by Sgt. Jefferson, of a February 17, 1980 interview regarding the second six months of 1979 activity. A similar interview was conducted with every officer in the squad, in an effort to improve performance. They were not disciplinary in nature. Vermett's overall standing in the field of 40 officers was 33rd, which was below the Post average and "far below the potential of this officer." Performance problems were noted as to aggressiveness working patrol, DUIL arrests, and enforcement of traffic laws. Low productivity was felt to be indicative of insecurity in the application of the motor vehicle and criminal laws (Exhibit 72). When these problems were discussed with Vermett, she agreed that they existed. Vermett did not indicate that she felt she had been improperly or inadequately trained.

Vermett had continued problems with report writing. Her reports were late and incomplete. Vermett was counseled on numerous occasions on the subject, was given a handbook to use as a guide, and was told to use old reports as examples. Nevertheless, Vermett's efforts continued to be inadequate. Reports were submitted late and, when submitted to her for corrections, would be returned by Vermett unchanged or with the correction memorandum removed so that the sergeants would be required to review the entire report again. Frequently, her partner would end up submitting the reports that Vermett should have done. The procedures followed by the sergeants for the submission and correction of reports were the same for Vermett as they were for every other squad trooper.

Vermett was also deficient in her knowledge and understanding of criminal and traffic laws, despite the fact that a basic knowledge of these laws is taught in Recruit School. Vermett was instructed by both sergeants repeatedly on the criminal and traffic laws and, like every other trooper, was given a copy of the Vehicle Code Book. Nevertheless, she would frequently omit elements from reports of criminal investigations, and would frequently display ignorance about even minor traffic violations.

Another frequent problem with Vermett was her demeanor in public. She was loud and did not act with the professional decorum expected of a State Police Officer.

In sum, Vermett's performance while a member of the Fourth Squad was poor. Despite repeated counseling sessions, she did not improve and, it appears, did not want to take the measures necessary to perform as well as even a trooper of average competence.

Vermett's last performance interview with Sgts. Jefferson and Raczkowski occurred on May 20, 1980. A rough draft memorandum regarding this interview, dated June 15, 1980, was presented to the Court as an exhibit. Again, Vermett's performance was discussed, including specifically her poor report writing, noncompliance with Post policy and rules and regulations of the Department, lack of knowledge of criminal and traffic laws, late arrivals or failure to appear for squad briefings, lack of knowledge of Official Orders, failure to stay at her post when assigned to desk duty, poor driving ability, and her argumentative attitude and failure to perform her fair share of the work when on two-person car patrol. Vermett's performance was said to be well below that expected of an officer with more than one year of experience. (Exhibits 37 and 73). Vermett reacted with tears to the interview. She, for the first time, indicated that she had not been properly trained. She mentioned her perceived sexual harassment by Trooper David Haire (discussed later in this Opinion), and that she was offended by jokes and cartoons that occasionally appeared at the Post. She also referred to her problems at the Sault and indicated that this was still interfering with her job performance. She stated that she felt she would be more comfortable working in a different squad, and possibly working with a female officer.

Sgts. Jefferson and Raczkowski discussed the performance problems cited in this interview with Lt. Tomczyk, and it was decided that Vermett would be reassigned to another squad at Northville.

### B. Vermett's Performance—Second Squad

Vermett was reassigned to the Second Squad in June 1980. She was to work with Trooper Sandra Miller, a friend. Miller's reputation at Northville was that of an excellent, respected officer who got along well with all the other officers. She had significant, and successful, experience in training younger officers and, in fact, was then the top training officer at Northville. When approached by Lt. Tomczyk with the prospect of working with Vermett, Miller welcomed the opportunity.

Miller, now a sergeant, has been with the Department since 1974. She testified that she encountered some resistance from male officers at her first assignment at the Battle Creek Post, but that eventually these officers came to respect her work and, in fact, even asked to be assigned to work with her. Miller was the first female trooper assigned to the Battle Creek Post. Miller was assigned to Northville in October of 1978, and was the fifth female trooper there. In Miller's opinion, Northville was a fun Post, where team work was vitally important. She described the Second Squad as having a friendly, family-type atmosphere, where there was no attitude of rejection of females as road officers.

Miller was aware from conversations with Vermett that she was having difficulty on the Fourth Squad. Miller was confident that Vermett would be welcomed by all the troopers on the Second Squad and that she could succeed in that environment.

When Lt. Tomczyk approached Miller about working with Vermett, he assured Miller that his only purpose was to help Vermett become a better trooper.

Miller worked with Vermett for about twenty days. She had been scheduled to work with her for ninety, but did not due to Vermett's frequent use of sick time and scheduling difficulties. Miller stopped working with Vermett at Miller's request, because she believed Vermett was not performing as she should be for her level of experience at the Department and on the road, even making allowances for any claimed inadequacy of training. Vermett had not learned what she should have from being on the road and working with a partner. Miller was surprised by her lack of knowledge regarding the law, and her deficient interrogation skills. Vermett's report writing also remained deficient. Miller perceived Vermett's problems to stem mainly from a lack of confidence, which Miller tried to build. However, instead of concentrating on the road and learning proper police work, Vermett spent the majority of her time talking about what she perceived to be happening to her at the Post. Traffic violators would go unapprehended because of her preoccupation. Vermett simply was not doing, or learning, her job. Miller was concerned for her own safety, as well as Vermett's, because of the latter's failure to concentrate on the job.

Miller found Vermett to be what she viewed as overly sensitive to comments of the public, citing one incident in particular when Vermett, enraged, yelled at a citizen because he called Miller a "young lady." Miller was concerned about Vermett's reactions. Miller also found herself defending Vermett's behavior to the other officers in the squad, even at times when Miller thought Vermett's behavior was inappropriate, thus affecting Miller's relationship with these officers.

In Miller's opinion, Vermett was not competent as a State Police Officer. What made Vermett especially incompetent and even dangerous as a trooper, was her "paranoia" about being a female on the job. For the amount of experience Vermett had with the Department, she was one of the worst troopers Miller had ever seen.

Introduced as an exhibit at trial was a September 16, 1980 interview of activities for the first six months of 1980 signed by Vermett and Sgt. Sauer (Exhibit 74). The document lists Vermett's activities on patrol, and rates them by category as average or below average. Sauer's language is very positive and full of encouragement for Vermett, and indicates he is sure she can and will improve. Sauer writes that he believes Vermett has all the capability to be an above average trooper, but that she suffers from a lack of self-confidence. He states his desire to have Vermett "shine," and views her as a "diamond-in-the-rough." He welcomes her to the Second Squad and states he is glad to have her "on our team."

Sgt. Harry Broadbent was assigned to the Second Squad in December 1980. He had previously been with the Third Squad at Northville, and had interviewed Vermett when she first came to the Post. She had not indicated that she thought she had been inadequately trained.

Broadbent first noticed problems with Vermett's late and inadequate submission of reports. Additionally, immediately after his arrival in the Second Squad, Broadbent began receiving reports of problems with Vermett's work performance from other troopers. By January of 1981, Broadbent felt the need to meet with Vermett and discuss her performance problems. He had decided, after consulting with Sgt. Sauer, to do so earlier, but waited until after the holiday season. By then, he had been approached by several officers who indicated they did not want to work with Vermett and, in fact, a few officers who had refused to do so. About one-half of the squad, including Sandy Miller, had declined to work with Vermett. Reasons cited by the officers were Vermett's poor driving abilities, her inability to deal with the public on the road, her indecisiveness and extraordinary leaning on partners for decision-making, submission of late reports, excessive

use of sick time, and her loud and vulgar language and demeanor in public. Broadbent had never had an officer refuse to work with Trooper Miller, nor had an officer ever requested that he/she not be assigned to Miller.

When Broadbent discussed these problems with Vermett and suggested corrective measures she could take to change the situation, Vermett's reaction was to demand to know who the officers were that had made the complaints. She insisted she did not know what the problems were, but alluded to having received a lack of training at the Sault. She had no explanation when Broadbent pointed out the personal nature of many of the problems. Moreover, she had no explanation for Broadbent's suggestion that she had been at Northville long enough and worked with enough officers to have made up for any insufficient training at the Sault. Broadbent did not tell Vermett the names of the officers, but suggested she consult with all the other troopers, on a friendly basis, to see if some corrective actions could be taken. Vermett at no time indicated she believed she was the object of sexual discrimination or sexual harassment on the Second Squad, or on the Fourth Squad. Vermett was visibly upset by the conversation and asked what would happen if there were no improvement. Broadbent indicated she would possibly be given affirmative assistance in the future, such as more schooling.

Sgt. Broadbent on numerous times criticized Vermett's report writing, but she repeatedly responded that she did not know she had to do it a certain way. As report writing was repetitious and done on a daily basis, and one learns from doing them, Vermett's excuses were found incredible. Suggestions were made on ways to improve, but it was frequently observed by Broadbent that Vermett was leaning unduly on her partners for guidance and assistance with even routine procedures.

Vermett was involved in several car accidents while on patrol. In some instances, Vermett was at fault, including accidents on December 13, 1979, and March 13, 1980.

(Exhibit 70 Personnel File, pages 34, 35, 318, 319.)

Vermett took numerous days off for sick leave. She indicated to Trooper Miller that she was taking "mental health" days. The result was that her partners could not rely on her to report for work.

Introduced as an exhibit at trial is a February 1981 performance evaluation prepared by Sgt. Broadbent, Lt. Tomczyk and Sgt. Sauer. Part II of this report notes Vermett's problems in the area of interpersonal relationships with her fellow troopers and the public, her lack of consistency in work habits (i.e., tends to improve for brief periods only after counseling), and a need to learn to accept constructive criticism and react in a positive way. Vermett's excessive use of sick leave was cited by Lt. Tomczyk, and was discussed with Vermett. She signed this document. (Exhibit 76). Part I, which appears to be a computer printout of a performance profile, gives in narrative form suggestions for ways in which Vermett's performance could possibly improve. Included among the areas listed are familiarity with Department rules and regulations, report writing, investigation skills, determination and self-motivation on the job, inventiveness and resourcefulness on the job, and greater understanding of people. It is suggested that Vermett attempt to develop more loyalty and allegiance to the Department and its members, as well as develop more honest, trustworthy relationships with both command and fellow workers. This performance evaluation, called an ADI, is a standard form prepared for all troopers based on the same criteria. Its purpose is to reinforce good police work, and to point out and help to correct deficiencies. It is not a disciplinary report, and is kept for only two to three years. The document is seen only by the Post lieutenant, the squad sergeants, and the officer involved. It is not viewed by other troopers. Part I of the ADI comes from Lansing in response to form questions filled out by the officer's superiors. Any negative comments can be remedied by the officer's subsequent per-

formance. An ADI is not associated with affirmative assistance, which is a situation where an officer is told of performance deficiencies and given a period of time in which they should be corrected. Vermett was not placed on affirmative assistance or disciplined while at Northville.

Within two to three weeks after her review of the February 1981 ADI evaluation, Vermett stopped reporting for work. Lt. Tomczyk called Lansing and was informed she was on medical leave of absence as of March 6, 1981. Vermett resigned from leave on December 16, 1982, per stipulation of the Workers Compensation redemption agreement.

### C. *Vermett's Attitude*

As was his normal practice, Lt. Tomczyk met with Vermett when she was first assigned to Northville. Two things stood out at this meeting: Vermett was extremely defensive, and she appeared to place a barrier between them. Assurances from Tomczyk that he was not concerned with her past but only with her performance at Northville did not alleviate the situation.

Vermett also met with Sgt. Broadbent upon her arrival. She became very defensive and upset when he asked about her road patrol experience at the Sault. He knew nothing about her background and was asking only so he could determine where she should be assigned.

Sgts. Raczkowski and Jefferson had the same experience at their initial meeting with Vermett. She defensively asked why they wanted to meet with her. Again, they were interested in her work experience so they could make a proper job assignment; a practice they used with all new officers at the Post.

From her first assignment on, Vermett was not receptive to being given advice from other officers, including those assigned as her partners on road patrol. She displayed an attitude that drove people away. She was abrasive, aggressive, and openly hostile at times.

Vermett expressed, at least to Troopers Fields and Miller, an attitude hostile to the Department. She indicated to Fields that she believed, without giving a factual basis for the belief, that the Department was out to get her; waiting and watching for her to fail.

Vermett frequently interpreted words and actions as affronts of a sexual nature. Sandy Miller described Vermett's concentration on male-female issues as so single-minded that it drained Miller to work with her every day. Vermett often excused her poor performance as being the result of these concerns.

Vermett made it clear to Miller that she intended to leave the Department long before she did so. She discussed it frequently, and also made it clear that she did not intend to leave empty handed; i.e., she intended to take some of the Department's money with her. Miller believes that from the moment Vermett came to Northville, she never really tried, or intended to stay. Although Miller counseled her to stay and try to work out her problems, and other troopers talked to Miller and Vermett about this, Vermett did not do so. One meeting occurred in February 1981, when the entire Second Squad, minus sergeants, gathered to tell Vermett they wanted to help, and wanted her to stay. Nevertheless, Vermett's bad attitude and constant complaints continued, and she went on leave shortly thereafter.

### D. *Specific Incidents of Alleged Sexual Harassment*

In addition to alleging a general atmosphere tainted with discrimination and harassment, Vermett alleges several specific incidents of sexual harassment perpetrated against her while at Northville. Each incident was allegedly performed by Trooper David Haire, a trooper in the Fourth Squad.

#### 1. *"The Flashlight Incident"*

There is no dispute that this incident occurred. There is, however, dispute between Vermett, Haire, and witness Trooper

Gregory Aho, as to exactly what occurred. Based upon my conclusions as to the credibility of the witnesses, I am convinced the following took place.

Sometime in March 1980 at the end of the midnight shift, Haire entered the squad room carrying his gear. On his way to a storage area, he passed behind Vermett, who was standing, legs apart, talking to Aho. As he did so, Haire hesitated, then raised his flashlight between Vermett's legs at knee level and moved it up and out. Vermett was not touched by Haire or the flashlight. Aho smiled and Vermett became angry. Haire apologized when he realized she was angry, and Vermett left the room. Aho did not intercede, and was puzzled as to Vermett's anger, given her normal participation in squad pranks and jokes. Vermett did not report this incident to her superiors at that time.

### 2. "The Shotgun Incident"

Whether this incident occurred was hotly disputed at trial. Vermett contends that one day in approximately July 1979 she was leaving the squad room as Haire was entering, carrying his gear. As they passed at the door, Haire thrust his cased shotgun into Vermett's crotch. Vermett, stunned, walked away. Haire pursued, pointed the cased shotgun barrel up to his nose and said "Umm, smells good." Trooper Kanuth was allegedly present, witnessed the incident, and laughed. He (according to Vermett) remarked that Vermett "must not have a sense of humor." She did not report the incident at that time.

Trooper Haire denies the incident took place. Trooper Kanuth also denies the incident took place and states, moreover, that he would not find such an incident something about which one should have a sense of humor. Trooper Sandy Miller testified that although she was friends with Vermett and Vermett had told her about the flashlight incident, she never told Miller of an incident involving a shotgun. Interestingly, Miller had told Vermett about an incident that had occurred to her in which her partner had thrust a cased shotgun between her legs from behind and she had become angry.

Having considered the evidence, and the demeanor of the witnesses, I do not believe the shotgun incident occurred. Perhaps Vermett fabricated the incident, or perhaps Sandy Miller's reference to her own shotgun incident somehow became fixed in Vermett's mind as having actually occurred to her. In any event, I find no sexually harassing shotgun incident to have occurred.

### 3. Miscellaneous Incidents

Vermett alleges several incidents of Haire holding a coffee cup shaped like a breast and fondling the nipple while staring at her chest. Haire, while admitting to use of the cup for a brief period (it had been a gift from a female state police employee), vehemently denies the allegations. Vermett neither named nor produced any witnesses to these events.

Vermett also contends Haire on several occasions stood behind her making pelvic thrust motions and licking his lips, but that when she turned around in response to other troopers' laughter, Haire would be doing nothing. She indicated these events occurred following the March 1980 flashlight incident. Haire also denies these incidents occurred. Vermett produced no corroborating witnesses, although she testified she only knows of the incidents because she was so informed by other troopers.

Having considered this evidence and the credibility of the witnesses, I do not believe any of these incidents occurred.

### 4. Vermett's Response to the Alleged Incidents

Vermett did not report any of the incidents when they allegedly occurred. In May of 1980, when Vermett was carpooling with Sgt. Raczkowski, she casually mentioned one incident in the context of their discussion of the movie "Norma Rae." Vermett indicated that in March 1980 she had been "goosed" with a shotgun by Trooper Haire. Vermett did not mention a

flashlight incident nor did she mention the shotgun incident alleged to have occurred in July of 1979. Vermett indicated Trooper Aho witnessed the event. She did not mention Trooper Kanuth. Sgt. Raczkowski responded by indicating to Vermett that she had a right to file a complaint against Haire, but she stated she did not wish to do so. In fact, she indicated she did not want to pursue it in any way and did not even want Haire to be questioned about the incident. Vermett never indicated there were two alleged incidents, one involving a flashlight and one a shotgun.

After discussing the matter with Sgt. Jefferson, Raczkowski decided to question Aho and Haire. Sgts. Jefferson and Raczkowski did so and were told consistent stories of the flashlight incident of March 1980. Trooper Haire was counseled, given a verbal reprimand, and a negative ADI performance evaluation which apparently was a factor in his failure to be promoted to sergeant. Because Vermett did not wish to pursue the matter, no further action was taken.

In June 1980, when Vermett was discussing her performance evaluation with Lt. Tomczyk, she told him of the incident as an explanatory response to his criticism of her work performance. Vermett also told Tomczyk she did not wish to pursue the matter by filing a complaint. When Tomczyk suggested that she talk to Dorothy Hall, the Department's Affirmative Action Officer, she agreed. Tomczyk subsequently contacted Hall, and assumed a meeting would take place. Tomczyk also contacted Raczkowski and Jefferson, learned of their findings, and determined that they had taken appropriate action.

Dorothy Hall later contacted Vermett, and a meeting was arranged. On the advice of counsel, Vermett cancelled the meeting and refused to make another appointment.

At no time did Vermett file a formal complaint (verbal or written) against Haire or any other member of the State Police; at no time did she file a grievance as provided for by contract; at no time did she file a complaint with the Civil Service Commission. Vermett is charged with knowledge of the availability of these procedures, as part of her duty to read her contract, departmental rules, regulations, orders, and memoranda, and the Civil Service Rules. As further evidence of Vermett's knowledge of the availability of these procedures, she had been informed in March 1980 of a sexual harassment complaint filed by Sandra Miller, and in fact had read the complaint. Vermett also did not take advantage of statements by Col. Hough and other superiors upon her reinstatement that she should contact them if she encountered any difficulties at Northville.

### E. *Horseplay/Joking at Northville*

It is not seriously disputed that in a high pressure job such as that of a police officer, horseplay and joking are necessary means to relieve stress. There is ample support for the conclusion that Vermett, herself, engaged in these antics, that she joked sexually and non-sexually with the other troopers, and that she was on occasion vulgar. On at least one occasion, Vermett was counseled for her vulgarity and loudness at the Post. David Haire, in particular, was considered a squad "clown," who engaged in antics found silly and childish by some, and humorous by others. These antics included "goosing" other troopers with objects such as a flashlight. Vermett testified to incidents of his horseplay that she found amusing, (i.e., an attention slip stapled to his trouser zipper which became stuck). Haire was known to commit these pranks on both male and female troopers alike. Such horseplay by the troopers was considered a sign of acceptance. If one did not like these activities, he or she could say so and not include him or herself.

### III. VERMETT'S JOURNAL

During the course of her employment with the State Police, Vermett kept a voluminous two-volume journal, or diary. There is some repetition in the two volumes, for reasons unknown. The Court

has read with great interest the entire journal, but considers its credibility as "evidence" limited by Vermett's admission at trial that she began writing it on the advice of her attorney in January 1979 when Vermett was discharged from her position at the Sault. In fact, a close reading of the journal convinces me that it was written with two purposes in mind: potential litigation against the Department, and a future book authored by Vermett.

The journal provides both consistent and inconsistent versions of events Vermett testified to at trial, and numerous inconsistencies with the credible testimony of other witnesses at trial. More importantly, the journal reads as written by an insecure and very angry woman; insecure in her abilities, angry at men in general and her male co-workers and superiors in particular. Vermett's words demonstrate an individual highly suspicious of each male act or failure to act, word or silence, and her imagined motives behind each. Vermett's words demonstrate an inability or unwillingness to accept criticism of her performance, and a tendency toward suspiciousness and to perceiving even the most inconsequential word or deed, or even the absence of a word or deed, as directed toward her gender. These same attitudes and perceptions were evident in Vermett's testimony at trial. In sum, the attitude displayed is of a deeply troubled woman pre-disposed to interpret her experiences at the State Police as sex discrimination or sexual harassment and thereby, tragically, destined to fail.

## IV. PURGED MATERIALS

Vermett consented to the signing of a Settlement Agreement with the Department following her discharge from the Sault Post. Although the Department signed the Agreement in early May 1979, Vermett did not sign until May 29, 1979, after her reinstatement at Northville. A provision in the Agreement stated that certain records of Vermett's employment at the Sault were to be expunged from her personnel file. On May 21, 1979, and again in June, 1979, Vermett viewed her personnel file and found the objectionable materials present. She complained to Sgt. Jefferson after the June viewing. He contacted Lt. Tomczyk, who had the documents removed and sent to Lansing.

Although Vermett attempts to make much of this incident, and while it may well be found to be a breach of contract in her state court lawsuit, I do not find this to be an incident of either sex discrimination or sexual harassment.

## V. PSYCHIATRIC TESTIMONY

A great deal of evidence, both in testimony and by documentary exhibits, was introduced on the subject of Vermett's emotional condition during the period she was employed as a trooper and in years subsequent. As is frequently seen in the difficult study of the human psyche, the opinions vary greatly. There is some agreement as to Vermett's vulnerability and insecurity, and as to her worsening states of depression and anxiety. There is some degree of disagreement as to whether Vermett suffers from some type of personality disorder, the degree to which she is prone to fantasy, exaggeration, confabulation, and fabrication, the appropriateness of her reactions to her environment, and her tendency to rationalize her performance failures by blaming outside influences (real or imagined).

While it would be presumptuous, and is unnecessary, for me as a Judge to make a definitive psychiatric diagnosis of Vermett's emotional difficulties, it is clear that Vermett, for whatever reason, was destined to fail as a police officer. Consideration of the psychiatric evidence, coupled with the entries in Vermett's journal, and her testimony at trial convince me that she suffered from serious vulnerabilities and insecurities as she entered police work, that she was pre-disposed to view actions by male co-workers and superiors as being directed toward her as a female, that she was pre-disposed to view her treatment as a police officer as different from the treatment afforded male police officers (even though she could cite no examples where she had actually witnessed this to be true),

and that Vermett's perceptions of her treatment became more and more distorted as time went by. Tragically, it appears the day-to-day reality of police work did not, and probably could not, live up to Vermett's childhood fantasy of the romantic life of a state police officer. As this realization struck Vermett, her emotional state deteriorated, her performance deteriorated (or at least her efforts to improve her performance lessened), she rationalized her poor performance in terms of actions of others (sex discrimination, sexual harassment), she took substantial amounts of time off work for "mental health" days as a means of escape, and she became emotionally and to some extent physically disabled. Whether due to her unfortunate childhood and family experiences or other intangible factors, Vermett's ultimate failure as a state police officer was inevitable.

## VI. DEPARTMENTAL POLICY

A September 3, 1975 memorandum from the Director of the State Police to all Bureau, Division, District, Post and Section Commanders indicates that the Department fully endorses the State's policy of providing equality of opportunity for all individuals in State employment and the establishment and maintenance of an affirmative action program of equal employment opportunity. Women are listed as among the minorities included in the plan. This policy was reiterated in a September 6, 1977 memorandum from the Director.

A September 1977 Consent Decree entered in the United States District Court for the Western District of Michigan following the filing of a lawsuit alleging discrimination on the basis of race, sex, and national origin contains, inter alia, a provision that the Department is to institute a recruitment program designed to increase the number of women applicants. Page 5, Paragraph (C) states in part: "Defendants will recruit and hire women into general law enforcement positions as Trooper 07 and Service Trooper 05 and will adopt and seek to achieve the goal of graduating at least fifty (50) women into the position of Trooper 07 over the next four academy

classes." Vermett entered Recruit School when the Department was acting under this Decree. There have been numerous written statements by the Department, prior and subsequent to the Consent Decree, indicating its general policy toward the treatment of women in the Department.

Official Order No. 1, which remains in effect, and the contents of which all Department members are required to be familiar, was in effect in December 1976. It provides, in relevant portion, that the Department is committed to fulfilling the mandates of the non-discrimination provision of all state and federal rules and regulations, and that the Department will not exclude any individual because of gender from consideration for "examination, employment, appointment, promotion, or retention." It further states that no member of the Department is to display bias or prejudice against any individual.

The Department's EEO Plan, submitted by the Personnel Division July 25, 1977, contains the Department's plan for implementation of its affirmative action program in response to the Consent Decree. Its policy statement indicates that the Department is "philosophically and legally" committed to the non-discrimination provisions of all state and federal rules and regulations, and to the utilization of affirmative action with regard to the employment of women and other minorities. All supervisory personnel are informed that they are not to tolerate harassment or discrimination. Specific provisions for the employment of women and other minorities are outlined.

A June 16, 1978 memorandum from the Director informs all management personnel again that all personnel actions are to be based solely on individual merit and fitness without regard to sex or other characteristics. Absolute objectivity is mandated. Failure to support and carry out the Department's policies in the area of affirmative action will result in disciplinary action.

A May 24, 1979 memorandum from the Personnel Division to all Bureau, District, Post, Section and Unit Commanders again

cites federal and state law, the Department's support of equal opportunity and employment, and indicates that a copy of the Department's EEO Plan should be on file in every Division, District, Section, and Post. A September 4, 1979 memorandum from the Personnel Division addresses ways in which women can be aided to increase their effectiveness in an organization by pointing out ways in which they are made to lose effectiveness by being subjected to disabling and demeaning treatment.

The November 19, 1979 amendment to Michigan's Civil Service Rule 1.2 specifies that "no person shall be subjected to sexual harassment by another employee in seeking employment or during the course of employment in the state classified service." This provision was applicable to Vermett and all other state troopers. By April 10, 1980 memorandum from the Director, all members of the Department were informed that the Michigan EEO Council had adopted the Civil Service Rule, and an attached definition of sexual harassment. The Department fully endorsed the Rule and definition, and stated its intent to aggressively address and eliminate problems of sexual harassment and sex discrimination. The policy was to be read and acknowledged by each member of the Department.

An April 1, 1980 circular from the Personnel Division directly addresses the issue of sexual harassment. The memorandum defines sexual harassment and discrimination, and states that management must not participate in or condone such conduct. The name, phone number, and address of the Department's Affirmative Action Officer is given as a person to contact concerning matters relating to complaints of sex discrimination and/or sexual harassment. An August 18, 1980 circular cites the Civil Service Rule on sexual harassment, defines sexual harassment, and again names the Department's Affirmative Action Officer as the person to whom complaints should be addressed. The circular informs the employee that resort to the Affirmative Action Officer will not diminish his or her right to file formal complaints either under the Civil Service Grievance Procedure or with the Department of Civil Rights.

In response to a high attrition rate among protected group individuals, including women, an October 14, 1980 memorandum from the Director of the Personnel Division indicates that every personnel action involving such an individual is to be channeled to the Affirmative Action Officer in the initial stages for positive input, as well as prevention of negative impact on the Department's affirmative action efforts.

It is evident that the Department had serious problems associated with the entry of females and other minorities as troopers, culminating in the aforementioned Consent Decree. While my ultimate conclusions in this lawsuit make it unnecessary for me to rule on the effectiveness of the Department's subsequent efforts Department-wide to alleviate these problems, I find that the Department had, during the time of Vermett's employment, a strong and consistent policy of affirmative action and intolerance for acts of discrimination on the basis of sex, including acts of sexual harassment.

## VII. SEX DISCRIMINATION

Section 703 of Title VII, 42 U.S.C. § 2000e–2, provides in part:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

Traditionally, claims of sex discrimination under Title VII have been confined to two contexts: disparate impact cases and disparate treatment cases.

Disparate impact cases involve a three-part analysis. To establish a prima facie case of discrimination, the Plaintiff must demonstrate that a facially neutral

employment practice had a significantly discriminatory impact. If that showing is made, the employer must then demonstrate that "any given [employment practice has] a manifest relationship to the employment in question" in order to avoid a finding of discrimination. The Plaintiff may still prevail, however, if she shows that the employer was using the practice as a mere pretext for discrimination. *Griggs v. Duke Power Company,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971). *See also Conn v. Teal,* 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982).

■■■ A case of disparate treatment also involves a three-part analysis. First, Plaintiff must establish a prima facie case of sex discrimination by demonstrating that she was treated differently in the terms and conditions of her employment than were male employees. Once Plaintiff has established a prima facie case, the burden of production shifts to Defendant, who must attempt to "articulate some legitimate, non-discriminatory reason" for its employment decision. Plaintiff must then prove that Defendant's articulated legitimate, non-discriminatory reason was merely a pretext for discrimination. Plaintiff at all times retains the ultimate burden of proving that she has been the victim of intentional discrimination. *See Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Board of Trustees v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Ford Motor Co. v. EEOC,* 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982).

■■■ While it is unclear whether Vermett alleges disparate treatment sex discrimination at Northville in addition to her allega-

tions of sexual harassment, having considered the evidence, I find no evidence of this form of sex discrimination, or of any intent to discriminate against Vermett while at Northville. Vermett was treated in the terms and conditions of her employment as a trooper the same as any other trooper, male or female. She admits to instances of verbal and written encouragement and extra assistance by her superiors and fellow officers. The record discloses that Vermett was given substantial assistance by superiors and other troopers to attempt to improve her performance as a trooper. Sadly, her performance did not improve, and she remained an ineffective and inadequate State Police Officer.

## VIII. SEXUAL HARASSMENT

Of relatively recent origin are claims of sex discrimination based on some form of sexual harassment in the work place. Although this is a fairly undeveloped area of Title VII analysis, it is now well established that sexually harassing conduct can amount to discrimination under Title VII. *See Vinson v. Taylor,* 753 F.2d 141 (D.C. Cir.1985); *Henson v. City of Dundee,* 682 F.2d 897 (11th Cir.1982); *Bundy v. Jackson,* 641 F.2d 934 (D.C.Cir.1981); *Coley v. Consolidated Rail Corp.,* 561 F.Supp. 645 (E.D.Mich.1982); *Robson v. Eva's Super Market, Inc.,* 538 F.Supp. 857 (N.D.Ohio 1982); *Hill v. BASF Wyandotte Corp.,* 27 F.E.P. Cases 66 (E.D.Mich.1981); *Munford v. James T. Barnes & Co.,* 441 F.Supp. 459 (E.D.Mich.1977). *Accord,* EEOC Guidelines on Sexual Harassment, 29 C.F.R. § 1604.11(a).[3]

Although sexual harassment may take many forms, there appear to be two predominant theoretical conceptions of sexual harassment forming distinct categories of sexual harassment claims: *quid pro quo* sexual harassment and work environment

---

**3.** Although the Equal Employment Opportunity Commission (EEOC) has not been given Congressional authority to promulgate rules or regulations pursuant to Title VII, the Guidelines are administrative interpretations of the Act and

may be considered by this Court. *See General Electric Company v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976); *Albermarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

sexual harassment.[4] *See Katz v. Dole,* 709 F.2d 251 (4th Cir.1983).

■■■ The former involves harassment that forces an employee to choose between acceding to sexual demands or forfeiting job benefits, continued employment, or promotion. The three-part *McDonnell Douglas, supra,* framework has been modified to accommodate these claims. To establish a prima facie case, Plaintiff must demonstrate that (1) a supervisor made sexual advances toward her, (2) submission to the sexual advances was a term or condition of employment, (3) this fact substantially affected Plaintiff's employment or was a motivating factor in her termination, and (4) male employees were not affected the same way by the alleged conduct. *See Hill v. BASF Wyandotte Corp., supra* at 71. Defendant can rebut Plaintiff's prima facie case by articulating a legitimate, non-discriminatory reason for the employment decision. Plaintiff must then prove that Defendant's articulated reason is merely a pretext for unlawful discrimination. *See also Henson, supra.*

■■■ The second category of sexual harassment claims, and that involved herein, involves suits challenging the persistent subjection of female employees to an intimidating, hostile, or offensive work environment. Loss of tangible job benefits, employment, or promotion are unnecessary to prove this form of discrimination. *See Vinson, supra; Bundy, supra; Henson, supra.*

■■■ Because the *McDonnell Douglas,* formula has been found unworkable in these cases, courts have formulated their own methods of analyzing claims of sexual harassment in working conditions cases. In *Katz, supra* at 255–56, the Fourth Circuit posited a two-step analysis:

First, the plaintiff must make a *prima facie* showing that sexually harassing actions took place, and if this is done, the employer may rebut the showing either directly by proving that the events did not take place, or indirectly, by showing that they were isolated or genuinely trivial. Second, the plaintiff must show that the employer knew or should have known of the harassment, and took no effectual action to correct the situation. This showing can also be rebutted by the employer directly, or by pointing to prompt remedial action reasonably calculated to end the harassment.

The ultimate burden remains with the Plaintiff throughout to prove the existence and the intentional nature of the sexual harassment. The mere existence of an official policy against such harassment is insufficient to absolve an employer on notice of sexual harassment of liability. *Katz, supra.*

■■■ The Eleventh Circuit, in *Henson, supra* at 903–905, formulated a five-part analysis of working conditions sexual harassment claims. This test was adopted in the Eastern District of Michigan and is, I believe, appropriate for cases of this nature. *See Coley, supra* at 647. Thus, Plaintiff in these sexual harassment cases must allege and prove (1) that she belongs to a protected group, (2) that she was subject to unwelcome sexual harassment, (3) that the harassment complained of was based on sex, (4) that the harassment complained of affected a "term, condition, or privilege" of employment, and (5) respondeat superior. *See also Rabidue v. Osceola Refining Co.,* 584 F.Supp. 419 (E.D.Mich. 1984).

In considering whether an employee was subject to unwelcomed sexual harassment, the definition of sexual harassment found in the EEOC Guidelines is helpful, and has been cited with approval. *See Henson, supra; Coley, supra.* 29 C.F.R. § 1604.11(a) states:

Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) sub-

---

**4.** For an interesting discussion of these two forms of sexual harassment, *see Note: Sexual Harassment Claims of Abusive Work Environ-* *ment Under Title VII,* 97 Har.L.Rev. 1449 (Apr. 1984).

mission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

The Guidelines go on to state that the Commission will make case-by-case determinations and will consider the totality of the circumstances, including the nature of the sexual advances and the context in which the alleged incidents occurred, in determining whether alleged conduct constitutes sexual harassment. 29 C.F.R. § 1604.11(b).[5]

■ With respect to the requirement that the harassment complained of was based upon sex, the Plaintiff must show that "but for the fact of her sex, she would not have been the object of harassment." *Henson, supra* at 904.

■ The sexual harassment alleged must be sufficiently pervasive so as to affect a term, condition, or privilege of employment. That is, there must be a "nex-

us" between the sexual conduct and the employment situation, *Coley, supra* at 649; *Sand v. Johnson Co.,* 33 F.E.P. Cases 716, 719 (E.D.Mich.1982), so that the sexual conduct has had the effect of "unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment." *Henson, supra; Coley, supra;* 29 C.F.R. § 1604.11(a)(3). A state of psychological well-being has been held to be a "term, condition, or privilege" of employment within the meaning of this fourth requirement for the establishment of employer liability. *Rogers v. EEOC,* 454 F.2d 234 (5th Cir.1971). The sexual harassment must be sufficiently severe and persistent as to affect the psychological well-being of the employee. *Coley, supra.* Although the sexual harassment need not be psychologically disabling, it must, under an objective standard, be so significant a factor that the average female employee would find that her overall work performance is substantially and adversely affected by the conduct. *Rabidue, supra* at 433. As explained in *Henson, supra* at 904, this is to be determined with regard to the "totality of the circumstances."

■ Ordinarily, more than one isolated incident of sexually offensive conduct

**5.** In *Keeping Women in Their Place: Stereotyping Per Se as a Form of Employment Discrimination,* 21 Bos.Col.L.Rev. 345, 375–377 (1980), author Nadine Taub takes the position that it is "fair" to require as a general matter that a woman attempt to make known to her harasser that she finds his conduct offensive.

In extreme cases, however, the harasser should not need to be advised that his conduct is unduly intrusive or humiliating. Included in this category would be physical advances, such as grabbing a woman's breasts or buttocks, putting hands under the woman's clothes or attempting to undress her, or masturbating in front of her; and verbal abuse, such as references to the size of the woman's breasts or the man's penis. In determining whether the woman in fact had given the harasser sufficient notice that his actions were unwelcome, a court should be particularly sensitive to circumstances such as the presence of customers preventing the woman from making her reaction known. Thus Title VII should prohibit acts of sexual harassment that the harasser knew or should have known were unwelcome.

In *Sexual Harassment Claims of Abusive Work Environments Under Title VII, supra,* footnote 3 at 1459, the author argues that the court should examine the claim objectively, from the perspective of the reasonable victim.

Such a standard would protect women from the offensive behavior that results from the divergence of male and female perceptions of appropriate conduct, but it would not penalize defendants whose victims were unusually sensitive. Courts could further protect sensitive employees by finding liability whenever a defendant persisted in sexually related conduct after the plaintiff had notified him that she found it offensive. This exception to the reasonable victim rule ... would also protect the defendant by ensuring that he would not be held liable for conduct not obviously offensive to a reasonable woman unless the victim had clearly communicated her distaste to him. By adopting the woman's point of view as the norm, the courts might heighten male sensitivity to the effects of sexually offensive conduct in the work place.

must have occurred. Abusive environments consist of multiple, even though perhaps individually nonactionable, incidents of unwelcome sexual harassment. However, the requirement for repeated exposure will vary inversely with the severity of the offensiveness of the incidents. *See EEOC v. Murphy Motor Freight Lines, Inc.*, 488 F.Supp. 381 (D.Minn.1980) ("more than a few isolated incidents of harassment must have occurred"); *Cariddi v. Kansas City Chiefs Football Club*, 568 F.2d 87 (8th Cir.1977); *Henson, supra* at 904 n. 8 (single incident of sufficient severity may create hostile environment); *Katz, supra* ("trivial" sexual harassment insufficient); *Vinson, supra* (a claim of sexual harassment cannot be established without a showing of more than isolated indicia of a discriminatory environment); *Bundy, supra* at 943 n. 9 ("although pattern and practice of harassment directed at a single employee can violate Title VII, casual or isolated manifestations of a discriminatory environment ... may not raise a cause of action"); *Sand, supra* at 719 ("cause of action does not arise from an isolated incident or a mere flirtation").

The final prerequisite to employer liability for working environment sexual harassment is that of respondeat superior. When the perpetrator of the harassment is a supervisor, some courts have held that the employer is liable notwithstanding the employer's lack of actual knowledge.[6] *See Vinson, supra* (stating further, at n. 71, that the mere existence of a company policy of nondiscrimination does not affect the employer's chargeability—such a policy affords small comfort when violations go unrectified); *Barnes v. Costle*, 561 F.2d 983 (D.C.Cir.1977) (suggests that an employer can escape liability if the supervisor acted in contravention of the employer's policy and without the employer's knowledge, and if the employer acted promptly and effectively to rectify the offense; *Bundy, supra*)[7]. However, other courts have imposed liability upon employers in work environment sexual harassment cases, for the acts of supervisors as well as co-workers, only if the Plaintiff proves that the employer knew or should have known of the sexual harassment and failed to take prompt and adequate remedial action.[8] *Henson, supra* at 905 (the employee can demonstrate that the employer knew of the harassment by showing that she complained to higher management, or by showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge); *Coley, supra; Vinson, supra* (as to co-workers, citing *Anderson v. Methodist Evangelical Hospital*, 464 F.2d 723 (6th Cir.1972)); *Katz, supra; Rabidue, supra*.[9]

**6.** In cases of quid pro quo sexual harassment, it has been held that the employer is strictly liable for all sex discrimination or sexual harassment by supervisors that results in tangible job detriment to the employee. *Henson, supra.*

**7.** Note also *Sexual Harassment Claims of Abusive Work Environment Under Title VII, supra* at footnote 3, wherein the author postulates that employers should be held strictly liable for all acts of sexual harassment communicated by supervisory personnel. Michigan's sexual harassment statute, which takes this position, is cited in support. M.C.L.A. § 37.2103.

**8.** The EEOC Guidelines, 29 C.F.R. § 1604.11, distinguished between agents/supervisors and fellow employees, but not between quid pro quo and abusive work environment claims of sexual harassment:

(c) Applying general Title VII principles, an employer ... is responsible for its acts and those of its agents and supervisory employees with respect to sexual harassment regardless of whether the specific acts complained of were authorized or even forbidden by the employer and regardless of whether the employer knew or should have known of their occurrence....

(d) With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can be shown that it took immediate and appropriate corrective action.

**9.** The author of *Sexual Harassment Claims of Abusive Work Environment Under Title VII, supra* at footnote 3, proposes that, although there should be strict employer liability for sexual harassment by supervisors, a requirement that employer's liability for harassment by co-workers be contingent upon constructive knowledge

■ In the instant case, Vermett, a female, satisfies the first requirement that she be a member of a protected class. I find none of the other requirements present. I have found that only one of the alleged incidents of sexual harassment actually occurred, the so-called "flashlight incident." I find, however, that under the cited definitions and standards, this was not an act of sexual harassment, nor was it an act based upon sex. It was not intended by David Haire to be an act of a sexual nature. In fact, it was an act Haire would have performed on any other trooper, male or female. Nor do I believe a reasonable woman would have found it to be an act of sexual harassment, or to have unreasonably interfered with her employment situation. Childish, yes; sexual harassment, no.

Furthermore, when informally told of the event by Vermett, her superiors took appropriate action. Haire was counseled, verbally reprimanded, and given a damaging performance evaluation. Vermett wanted no further action taken and, in fact, had stated a desire to have no action taken toward David Haire at all. I find the matter to have been handled appropriately and adequately by the Department.

## IX. RETALIATION

■ Based on the same grounds leading me to conclude Vermett's claims of sex discrimination and sexual harassment must fail, I find no evidence of retaliation for her having filed an EEOC charge after her termination at the Sault. To the contrary, I believe more than reasonable efforts to assist Vermett as a trooper were made at Northville and, to the extent any of her superiors at Northville may have been aware of the EEOC charge (it is unclear if any, with the possible exception of Lt. Tomczyk, were so aware), there is absolutely no evidence that this knowledge was in any way a factor in Vermett's treatment.

*See e.g. Bundy, supra; Sand v. Johnson Co., supra; Hill v. BASF Wyandotte Corp., supra;* Section 704 of Title VII, 42 U.S.C. § 2000e–3(a).

## X. CONSTRUCTIVE DISCHARGE

■ Allegations of constructive discharge must be examined on a case-by-case basis, and require an "inquiry into the intent of the employer and the reasonably foreseeable impact of the employer's conduct on the employee." *Held v. Gulf Oil Co.,* 684 F.2d 427, 432 (6th Cir.1982). Constructive discharge occurs when working conditions are such that a reasonable person would feel compelled to resign. *Easter v. Jeep Corp.,* 750 F.2d 520, 522–23 (6th Cir.1984). The situation is viewed objectively; that is, "a constructive discharge arises only when a reasonable person would find conditions intolerable." *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1256 (8th Cir.1981). The employer need not intend to induce the employee to resign. Rather, the employer must intend that the working conditions imposed upon the employee be such that a reasonable person would terminate her employment. As noted in *Held, supra* at 432, and *Jacobs v. Martin Sweets Co.,* 550 F.2d 364 (6th Cir. 1977), a "man is held to intend the foreseeable consequences of his conduct." Proof of discrimination alone, without any "aggravating factors," has been held an insufficient predicate for a finding of constructive discharge. *See Henry v. Lennox Industries, Inc.,* 768 F.2d 746 (6th Cir.1985). *See also Jacobs, supra; Coley, supra; Robson v. Eva's Super Market, Inc., supra.*

■ In the lawsuit at bar, because I have found no evidence of sexual harassment or sex discrimination committed against Vermett while at Northville, her claim of constructive discharge must of

by the employer is well-advised. "Because fairness demands that an employer not be exposed to liability when he promptly investigates a complaint and takes appropriate remedial action, an employer should be able to minimize exposure to liability by instituting a formal policy against harassment, providing a grievance mechanism, and taking prompt disciplinary action against offenders." *Id.* at page 1463. *See also* Nadine Taub's article *Keeping Women in Their Place: Stereotyping Per Se as a Form of Employment Discrimination, supra,* for an interesting discussion of the issue of employer liability.

necessity fail also. I am convinced that Vermett was not subjected to conditions, other than those created by her own physical and emotional difficulties, that a reasonable person would find intolerable.

## XI. TIMELINESS

42 U.S.C. § 2000e–5(e) provides:

A charge under this section shall be filed within one hundred eighty days after the alleged unlawful employment practice occurred ..., except that in the case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice ..., such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred,
....

The United States Supreme Court has recently held that the timely filing of a charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but rather a requirement that, "like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982). Nevertheless, plaintiffs are required to prove that they have satisfied the conditions precedent to a Title VII action. *See Jackson v. Seaboard Coast Line R. Company*, 678 F.2d 992, 1010 (11th Cir.1982).

In determining the timeliness of Vermett's EEOC complaint, this Court must first identify precisely the alleged unlawful employment practice of which she complains. *Delaware State College v. Ricks*, 449 U.S. 250, 257, 101 S.Ct. 498, 503, 66 L.Ed.2d 431 (1980). Vermett contends that the individual events specified in her Complaint are all related, in that they are part of the "continuing environmental nature" of sexual harassment and discrimination in the Department. Since there is this nexus between the discriminatory activity and work environment liability, Vermett contends, the fact that the last specific act of alleged discrimination occurred within the time provided for the filing of the EEOC charge is sufficient to bring all of the acts alleged properly within the purview of this lawsuit.

In *Held v. Gulf Oil Company, supra,* the Sixth Circuit affirmed a trial court decision wherein it was held that the plaintiff had been subjected to serious and continuous sex discrimination and that, since there was evidence that the discriminatory acts continued throughout her period of employment, the employee's action was not time barred. In addressing the timeliness question, the court stated:

[T]he Supreme Court of the United States in *United Air Lines v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 ... (1977) stated:

\* \* \* \* \* \*

A discriminatory act which is not made the basis of a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed ... separately considered, it is merely an unfortunate event in history which has no present legal consequences.

Plaintiff's termination was effective December 15, 1977, and her administrative claim was filed with the EEOC on February 16, 1978. Thus, any incident occurring more than 180 days prior to February 16, 1978, is legally insignificant. This result, however, does not obtain where subsequent identifiable acts of discrimination occur within the critical time period and are related to the time-barred incident .... In [*Woodard v. Virginia Board of Bar Examiners*, 420 F.Supp. 211 (E.D.Va.1976); *aff'd* 598 F.2d 1345 (4th Cir.1979) ], the District Court pointed out:

When a person challenges continuous discriminatory conduct rather than any single discriminatory act, the 180 day limitation period of Title VII ... [is] not operative.

420 F.Supp. at 214, n. 3.

\* \* \* \* \* \*

Thus, if the discriminatory acts commenced prior to the 180 day period and there was a continuous pattern of discrimination that continued into the 180 day period, plaintiff may still maintain her action even though single discriminatory acts prior to the 180 day period are barred. *Held, supra* at 430.

*See also Coley, supra;* and *Henson, supra,* for discussions regarding the creation of a hostile or offensive "work environment" by continuous acts of sexual harassment.

 In the instant case, Vermett alleged continuous acts of sexual harassment and discrimination throughout her period of employment. On Defendants' Motion to Dismiss Complaint or for Summary Judgment, I reserved ruling on the timeliness issue, so that Vermett could attempt to prove her allegations. Since I have now concluded that Vermett was not subject to on-going and continuous sexual harassment and discrimination, I find Vermett's EEOC complaint to have been untimely, and that she has failed to satisfy the conditions precedent to the filing of a Title VII action.

## XII. CLASS–BASED ANIMUS/CONSTRUCTIVE NOTICE

Counsel for Vermett have argued at length to the Court their broad constructive notice/class-based animus theory; that is, that the Department should have anticipated hostile and non-accepting attitudes in male officers with the coerced entry by Consent Decree of women as line officers, that the Department should have anticipated that these attitudes would result in acts of sexual harassment and sex discrimination toward officers such as Vermett, that the Department should therefore have taken corrective action at the time of the entry of women as officers to prevent these subsequent discriminatory acts from occurring, and that the Department failed to do so. Extensive testimony on this issue was presented by R. Kent Boesdorfer, H. Patri-

cia Curran; and by Col. Ritchie Davis, and Dr. Donald Rossi of the Department (both of whom testified with integrity and great concern for the treatment of women in the Department of State Police).

Vermett's theory, which is novel in this relatively undeveloped area of the law, is intriguing and attractive to this Court on a personal level. It will not, however, be ruled upon. I cannot rule in the abstract. Since I have found that Vermett, personally, was not a victim of sexual harassment or sex discrimination at Northville, it is unnecessary, and would be improper, for me to address Departmental attitudes that may or may not exist, and sexual harassment and sex discrimination that may or may not have occurred to others.[10]

## XIII. CONCLUSION

Based on the foregoing, I find in favor of all Defendants, and against Plaintiff Vermett, as to all allegations in her Complaint and Amended Complaint which remain pending before this Court.

## EPILOGUE

It has been with mixed emotions that I have penned this opinion. My primary concern, as always, has been to reach an informed, reasoned, and just result. Nevertheless, I am sympathetic to and deeply troubled by the plight of Elizabeth Vermett. I am convinced, however, that my ruling against her claims is correct. It is hoped that Ms. Vermett will be able to put her past experiences behind her, and to rebuild her life in a way that is productive and fulfilling. Glimpses of a fighting spirit of hope and survival evident in Ms. Vermett's journal convince me this is possible.

**10.** Vermett's Motion for Class Certification was denied by this Court on hearing and rehearing before trial.